MARVIN BEASLEY *v.* COMMISSIONER OF
CORRECTION
(AC 17295)

JOHN W. NARDUCCI, JR. *v.* COMMISSIONER OF
CORRECTION
(AC 17296)

O'Connell, C. J., and Schaller and Sullivan, Js.

Argued May 28—officially released September 22, 1998

*Timothy H. Everett*, with whom were *Jason Lipsky* and, on the brief, *Audrey Felsen*, certified legal intern, for the appellants (petitioners).

*Steven R. Strom*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *Gregory T. D'Auria*, assistant attorney general, for the appellee (respondent).

*Opinion*

O'CONNELL, C. J. The petitioners, Marvin Beasley and John W. Narducci, Jr., separately petitioned for writs of habeas corpus challenging the respondent commissioner of correction's Administrative Directive 9.4, paragraph five (July 6, 1994 amendment), which operates to restrict statutory good time eligibility for inmates classified in administrative segregation. The habeas court consolidated the petitions for trial and subsequently dismissed them. The petitioners' separate appeals from the dismissals were consolidated by this court because they raise identical appellate claims.

The petitioners claim that the habeas court improperly concluded that (1) the directive does not violate the ex post facto clause[1] of the United States constitution by retrospectively increasing the length of the petitioners'

---

[1] The constitution of the United States, article one, § 10, provides in relevant part: "No State shall . . . pass any . . . ex post facto Law . . . ."

sentence, (2) the commissioner did not deprive the petitioners of earned statutory good time credits without first according them hearings as required by General Statutes (Rev. to 1993) § 18-7a (c),[2] (3) the commissioner has statutory authority to adopt and enforce the directive, which precludes the petitioners from being eligible to earn statutory good time while classified in administrative segregation, (4) the commissioner's refusal to credit the petitioners with statutory good time pursuant to § 18-7a (c) does not violate the guarantee of equal protection under the law and (5) denial of statutory good time credit to the petitioners does not violate the guarantee of due process of law. We affirm the judgments of the habeas court.

The habeas court found the following facts. The petitioner Narducci is confined to the custody of the commissioner pursuant to eleven mittimuses the Superior Court issued on sentencing dates from 1989 through 1993. On April 12, 1994, Narducci was classified in administrative segregation[3] because of past and recent assaultive behavior. At the hearing that resulted in his administrative segregation classification, Narducci, who was assisted by a staff advocate, stated that he understood the reasons for the administrative segregation recommendation. Although Narducci has not been

---

[2] General Statutes (Rev. to 1993) § 18-7a (c) provides in relevant part: "Any person sentenced to a term of imprisonment for an offense committed on or after July 1, 1983, *may . . . by good conduct and obedience to the rules* which have been established for the service of his sentence, earn a reduction of his sentence . . . . Misconduct or refusal to obey the rules which have been established for the service of his sentence shall subject the prisoner to the loss of all or any portion of such reduction by the commissioner or his designee." (Emphasis added.)

[3] Administrative segregation is a level five confinement, which is reserved for inmates who are assessed to have violent tendencies, and who pose a safety threat to other inmates and to prison staff. Inmates assigned to administrative segregation are given a handbook providing information on the rules and procedures applicable to their confinement. The habeas court found that the purpose of administrative segregation is not to punish inmates, but to manage and control violent offenders.

given subsequent administrative segregation placement hearings, his status as an administrative segregation inmate has been subject to periodic review by unit and facility classification staff, including the warden.

On December 12, 1990, the petitioner Beasley was confined to the custody of the commissioner pursuant to two mittimuses issued by the Superior Court. On July 13, 1995, while serving a twenty year sentence for first degree manslaughter, Beasley was further sentenced to two years, consecutive to the manslaughter sentence, for second degree assault and possession of a weapon in a correctional institution, after stabbing and seriously injuring another inmate.

On March 15, 1995, Beasley was informed that he would be the subject of an administrative segregation classification hearing because of the near fatal assault in the institution. During the hearing, Beasley gave a statement to the hearing officer, saying that he understood the purpose of the hearing. Following the hearing, Beasley was classified in administrative segregation, subject to periodic review by unit and facility staff. Pursuant to Administrative Directive 9.4, each petitioner became ineligible to earn statutory good time upon being classified in administrative segregation.

During the habeas proceeding, the commissioner testified, and the court found, that his authority is established pursuant to General Statutes § 18-81.[4] Pursuant to this authority, the commissioner has promulgated a

---

[4] General Statutes § 18-81 provides in relevant part: "The Commissioner of Correction shall administer, coordinate and control the operations of the department and shall be responsible for the overall supervision and direction of all institutions, facilities and activities of the department. He shall establish rules for the administrative practices and custodial and rehabilitative methods of said institutions and facilities in accordance with recognized correctional standards. . . . He shall be responsible for establishing disciplinary, diagnostic, classification, treatment . . . programs throughout the department. . . ."

set of directives, which are written guidelines pertaining to several correctional facilities. These directives were not promulgated in accordance with the Uniform Administrative Procedure Act (UAPA), General Statutes § 4-166 et seq., and are utilized to establish the parameters for the operation of the facilities. These directives set forth procedures for dealing with inmates, define inmate classifications and are used as guidelines to adhere to the department's mission to maintain secure, safe and humane correctional facilities.

Administrative Directive 9.4 defines administrative segregation as "[p]lacement of an inmate on a Restrictive Housing Status that results in segregation of the inmate whose behavior, while incarcerated, poses a threat to the security of the facility or a risk to the safety of staff or other inmates, and that the inmate can no longer be safely managed in general population." Inmates being considered for administrative segregation are entitled to a classification hearing and to notification of the reasons forming the basis of the consideration. Once placed in administrative segregation, an inmate's classification status is subject to periodic review. The habeas court found that this procedure was followed with respect to both inmates.

On July 6, 1994, Administrative Directive 9.4 was amended to state that for the duration of time that an inmate is classified in administrative segregation, that inmate is ineligible to earn statutory good time. Notice of this change was provided to the inmate population via postings throughout the correctional facilities and the directives handbook, which is made available to all inmates.

For each inmate, the department maintains a document commonly referred to as a time sheet. This document reflects an inmate's total sentence, earned and forfeited statutory good time and an anticipated release

date. Because of difficulties in adjusting the computer program that generates this document, the time sheets for inmates classified in administrative segregation continue to show earned statutory good time since July 6, 1994, and the subsequent forfeiture thereof.[5]

During the period of time that the petitioners were classified in administrative segregation, they were ineligible to earn statutory good time. Narducci, who was classified in administrative segregation prior to July 6, 1994, was credited with statutory good time until the directive took effect.

It is well settled that the courts afford great deference to prison administrators in their operation and management of correctional facilities. "Prison administrators are responsible for maintaining internal order and discipline, for securing their institutions against unauthorized access or escape, and for rehabilitating, to the extent that human nature and inadequate resources allow, the inmates placed in their custody. The Herculean obstacles to effective discharge of these duties are too apparent to warrant explication. Suffice it to say that the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. For all of those reasons, courts are ill equipped to deal with the increasingly urgent problems

---

[5] The habeas court agreed with the petitioners that if the time sheets are read in isolation, it appears as if inmates are receiving and then forfeiting good time during each month of confinement in administrative segregation. The court concluded, however, that the form has to be viewed in the larger context of information provided to the inmate population. The habeas court found that Administrative Directive 9.4 itself was the operative rule, and the "maintenance and dissemination to inmates of flawed time sheets purporting to show a grant coupled with a forfeiture was an unartful and inaccurate attempt to accommodate the new directive to an unnecessarily rigid computer program."

of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism." (Internal quotation marks omitted.) *Washington* v. *Meachum*, 238 Conn. 692, 733–34, 680 A.2d 262 (1996).

I

The petitioners first claim that because Administrative Directive 9.4, paragraph five, restricts their eligibility to earn statutory good time while classified in administrative segregation, it violates the ex post facto clause of the United States constitution by retrospectively increasing the length of their individual sentences.

The petitioners concede not only that our recent decision in *Abed* v. *Commissioner of Correction*, 43 Conn. App. 176, 682 A.2d 558, cert. denied, 239 Conn. 937, 684 A.2d 707 (1996), controls this issue, but that if it is applied to the facts of this case, their argument must fail. They argue, however, that in light of the United States Supreme Court's decision in *Lynce* v. *Mathis*, 519 U.S. 433, 117 S. Ct. 891, 137 L. Ed. 2d 63 (1997), we must reverse *Abed* and find in their favor. We do not agree, and we conclude that *Abed* remains good law in Connecticut.

In *Abed* v. *Commissioner of Correction*, supra, 43 Conn. App. 178, the commissioner had adopted a new directive that authorized a segregated classification for prison gang inmates who were considered a safety threat to other inmates and to prison staff. Once classified in this manner, the inmate became ineligible to earn statutory good time pursuant to the directive. Id. The petitioner in *Abed*, who had been incarcerated prior to the adoption of this directive, challenged the directive on ex post facto grounds. Id., 182.

Our Supreme Court has held that an " 'act *ex post facto* relates to *crimes* only; it is, emphatically, the

making of an innocent action criminal. . . .' (Emphasis in original) *Bridgeport* v. *Hubbell,* 5 Conn. 237, 240 (1824); see also *Collins* v. *Youngblood,* 497 U.S. 37, 41, 110 S. Ct. 2715, 111 L. Ed. 2d 30 (1990). There is nothing in [the *Abed*] directive . . . that attempts to criminalize an otherwise lawful act. . . . The ex post facto clause does not prevent prison administrators from adopting and enforcing reasonable regulations that are consistent with prison administration, safety and efficiency." (Citations omitted; internal quotation marks omitted.) *Abed* v. *Commissioner of Correction,* supra, 43 Conn. App. 182–83.

The petitioners in the present case do not argue that the adoption and enforcement of the directive result in the making of an innocent act criminal, but rather that the prospective denial of good time credits effectively increases the punishment that is attached to the crimes for which the petitioners are already serving a sentence.[6]

In *Lynce* v. *Mathis,* supra, 519 U.S. 433, the United States Supreme Court reviewed a 1992 Florida statute that retrospectively canceled early release credits that had been awarded to prison inmates when the population of the state prison system exceeded predetermined levels. In *Lynce,* the petitioner was initially awarded such credits, which resulted in his early release from custody. Shortly after his release, the 1992 statute was interpreted as having canceled all provisional credits awarded to inmates convicted of murder or attempted murder. Because the petitioner originally had been convicted of attempted murder, the 1992 statute retrospec-

---

[6] There are four types of ex post facto laws. The first is " '[e]very law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action. [Second.] Every law that aggravates a crime, or makes it greater than it was, when committed. [Third.] Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. [Fourth.] Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender.' " *Lynce* v. *Mathis,* supra, 519 U.S. 441 n.13.

tively canceled the credits that had led to his early release, resulting in his rearrest and return to custody.

In 1994, the petitioner challenged the cancellation of his early release credits on the ground that it violated the ex post facto clause of the United States constitution. The District Court dismissed the petition, stating that early release credits were an effort to alleviate prison overcrowding and were not an integral part of the petitioner's punishment. Because of conflict among several federal circuit courts of appeal, the United States Supreme Court granted certiorari on this issue. Id., 436.

The United States Supreme Court held that "[t]o fall within the ex post facto prohibition, a law must be retrospective—that is, 'it must apply to events occurring before its enactment'—and it 'must disadvantage the offender affected by it' . . . by altering the definition of criminal conduct or increasing the punishment for the crime . . . . The narrow issue that we must decide is . . . whether those consequences disadvantaged petitioner by increasing his punishment." (Citations omitted.) Id., 441.

In concluding that the legislative act revoking the early release credits was an improper ex post facto law, the *Lynce* court held that the essential inquiry in an ex post facto analysis is whether the law "had the effect of lengthening petitioner's period of incarceration." Id., 443. The *Lynce* court recognized, however, that a consideration of legislative purpose, at times, may be relevant,[7] and that the " 'speculative and attenuated possibilit[ies]' of increasing the measure of punishment do

---

[7] The *Lynce* court further stated that "[w]hether such a [legislative] purpose alone would be a sufficient basis for concluding that a law violated the Ex Post Facto Clause when it actually had no such effect is a question the Court has never addressed." *Lynce* v. *Mathis*, supra, 519 U.S. 444. The court went on to conclude that the purpose behind the 1992 enactment of the offense based exclusion, namely, to prevent the early release of prisoners

not implicate the Ex Post Facto Clause . . . ." Id., 444, quoting *California Dept. of Corrections* v. *Morales*, 514 U.S. 499, 509, 115 S. Ct. 1597, 131 L. Ed. 2d 588 (1995).

The *Lynce* court ultimately concluded that "[i]n this case, unlike in *Morales*, the actual course of events makes it unnecessary to speculate about what might have happened. The 1992 statute has unquestionably disadvantaged petitioner because it resulted in his rearrest and prolonged his imprisonment. Unlike the California amendment at issue in *Morales*, the 1992 Florida statute did more than simply remove a mechanism that created an *opportunity* for early release for a class of prisoners whose release was unlikely; rather, it made ineligible for early release a class of prisoners who were previously eligible—including some, like petitioner, who had actually been released." (Emphasis in original.) *Lynce* v. *Mathis*, supra, 519 U.S. 446–47.

Although the petitioners in the present case rely almost entirely on *Lynce* to support their position, the more recent United States Supreme Court decision in *Kansas* v. *Hendricks*, 521 U.S. 346, 117 S. Ct. 2072, 138 L. Ed. 2d 501 (1997), must also be considered when an ex post facto claim is made. In *Hendricks*, the court granted certiorari to review the Kansas 1994 Sexually Violent Predator Act, which established procedures for the involuntary civil commitment of persons determined to be likely to engage in predatory acts of sexual violence. That act was invoked for the first time to effect the involuntary commitment of the petitioner, who had been scheduled for release from prison shortly after the act became law. Id., 350.

The United States Supreme Court held that the act was not a violation of the ex post facto clause because that clause, "which forbids the application of any new

convicted of murder related offenses, was insufficient to withstand an ex post facto challenge.

punitive measure to a crime already consummated, has been interpreted to pertain exclusively to penal statutes. *California Dept. of Corrections* v. *Morales,* [supra, 514 U.S. 505, quoting *Lindsey* v. *Washington,* 301 U.S. 397, 401, 57 S. Ct. 797, 81 L. Ed. 1182 (1937)]. As we have previously determined, the Act does not impose punishment; thus, its application does not raise *ex post facto* concerns. Moreover, the Act clearly does not have retroactive effect. Rather, the Act permits involuntary confinement based upon a determination that the person *currently* both suffers from a mental abnormality or personality disorder and is likely to pose a future danger to the public. To the extent that past behavior is taken into account, it is used, as noted above, solely for evidentiary purposes. Because the Act does not criminalize conduct legal before its enactment, nor deprive [the petitioner] of any defense that was available to him at the time of his crimes, the Act does not violate the *Ex Post Facto* Clause." (Emphasis in original; internal quotation marks omitted.) *Kansas* v. *Hendricks,* supra, 521 U.S. 370–71.

Our review of both *Lynce* and *Hendricks* leads us to the conclusion that in an ex post facto analysis, a court must first determine whether the challenged law is a penal statute and, if not, whether the law is so punitive in fact as to render it penal despite its intent.[8] "[T]he fact that the Act may be 'tied to criminal activity' is 'insufficient to render the [statute] punitive.' " Id., 362. Only "unmistakable evidence of punitive intent" will suffice to render a statute punitive. *Flemming* v. *Nestor,* 363 U.S. 603, 619, 80 S. Ct. 1367, 4 L. Ed. 2d 1435 (1960).

---

[8] Because we concluded that the directive at issue in *Abed* v. *Commissioner of Correction,* supra, 43 Conn. App. 176, was nonpunitive, our ex post facto inquiry properly ended there. Although we could end our analysis in this case with the conclusion that Administrative Directive 9.4 is nonpunitive, it is necessary to complete a thorough review to distinguish *Lynce* adequately from the present case.

"[W]hether a sanction intended as regulatory or nonpunitive is 'so punitive in fact' as to violate the ex post facto prohibition is a highly context specific matter." *Doe* v. *Pataki*, 120 F.3d 1263, 1275 (2d Cir. 1997), cert. denied, 522 U.S. 1122, 118 S. Ct. 1066, 140 L. Ed. 2d 126 (1998). Further, "only the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." (Internal quotation marks omitted.) *Hudson* v. *United States*, 522 U.S. 93, 100, 118 S. Ct. 488, 139 L. Ed. 2d 450 (1997).

In the present case, as in *Abed*, the challenged directive was not a penal statute and cannot be said to be punitive in nature. The habeas court found, and we agree, that the purpose for the rule precluding inmates from being eligible to earn statutory good time while classified in administrative segregation was not to punish but to aid in controlling the inmate population. Pursuant to the commissioner's authority, such administrative rules are explicitly permitted. See *Abed* v. *Commissioner of Correction*, supra, 43 Conn. App. 183.

Second, if the law is determined to be punitive in nature, it must then be found to apply to events occurring before its enactment. *Lynce* v. *Mathis*, supra, 519 U.S. 441. In the present case, Beasley was classified in administrative segregation on March 23, 1995, and the policy change implementing paragraph five of Administrative Directive 9.4 became effective on July 6, 1994. Beasley was classified in administrative segregation because of his ongoing failure to comply with the prison's rules of good conduct, not because of the crime for which he was serving a sentence. Therefore, as to Beasley, the directive applied to events occurring *subsequent* to its promulgation, resulting in Beasley's failure to remain eligible for statutory good time.

The final step in an ex post facto analysis is to determine whether the effect of the newly enacted law increases the amount of the punishment imposed for the crime's commission. See *Lynce* v. *Mathis*, supra, 519 U.S. 443. Unlike in *Lynce*, where it was undisputed that the new statute increased the petitioner's penalty by virtue of his rearrest, in this case the effect of the directive on the length of the petitioners' sentences is purely speculative. *California Dept. of Corrections* v. *Morales*, supra, 514 U.S. 508–509. In Connecticut, the awarding of statutory good time is within the commissioner's discretion. See General Statutes § 18-7a (c) (inmates may, by good conduct and obedience to rules, earn statutory good time subject to reduction by commissioner). It is therefore impossible to know whether the petitioners will forfeit good time credits that they may later earn and, thus, the establishment of an actual release date for either petitioner is speculative, at best.

We conclude that the habeas court properly found that the directive was not in violation of the ex post facto clause of the United States constitution.

## II

The petitioners next claim that the commissioner deprived them of statutory good time without according each of them a hearing. The petitioners argue that while classified in administrative segregation, they earned 195 and 296 days of statutory good time, respectively, of which they were deprived without a proper hearing. We do not agree.

As determined in part I of this opinion, the adoption of Administrative Directive 9.4 was a proper exercise of the commissioner's authority.[9] Pursuant to the directive, once classified in administrative segregation, the

---

[9] Because the inmates were ineligible to earn statutory good time, the holding in *Nichols* v. *Warren*, 209 Conn. 191, 550 A.2d 309 (1988), which states that an eligible inmate cannot forfeit good time credits not yet earned,

petitioners became ineligible to earn statutory good time. The specific number of days of which the petitioners claim they were deprived was listed on each petitioner's time sheet, which the habeas court found to be simply "an unartful and inaccurate attempt to accommodate the new directive to an unnecessarily rigid computer program."[10] We conclude that the habeas court properly found the directive itself to be the operative rule and that the petitioners never earned the statutory good time of which they claim they were denied. The petitioners' contention, therefore, that such good time credits were refused without a hearing is without merit.

### III

The petitioners next claim that the commissioner lacked the statutory authority to adopt and enforce Administrative Directive 9.4, paragraph five, which precluded them from being eligible to earn statutory good time. The petitioners contend that such adoption and enforcement was an ultra vires act by the commissioner because (1) he does not have statutory power under §§ 18-81 and 18-7a (c) to make an inmate ineligible to earn statutory good time[11] and (2) the directive was not promulgated in accordance with the UAPA. We do not agree.

In *Abed* v. *Commissioner of Correction*, supra, 43 Conn. App. 180, we held that pursuant to the plain language of § 18-7a (c), the commissioner may award good time credits at his discretion. Section 18-81

does not apply. *Abed* v. *Commissioner of Correction*, supra, 43 Conn. App. 181.

[10] See footnote 5.

[11] The petitioners originally stated this claim as follows: "[T]he commissioner does not have the statutory power under § 18-81 and § 18-7a (c) to abolish statutory good time for an eligible inmate." Although initially articulated this way, the petitioners' argument addresses the issue as presented in the body of this opinion. Consequently, we have decided this claim as briefed and argued by the parties.

expressly permits the commissioner to promulgate the prison's administrative rules. In *Abed*, we stated that "*Nichols* [v. *Warren*, 209 Conn. 191, 550 A. 2d 309 (1988)] does not conclude that § 18-7a (c) compels the automatic award of good time credits, but rather concludes that once an inmate has become eligible to earn statutory credits, such credits cannot be surrendered before they are earned." *Abed* v. *Commissioner of Correction*, supra, 181. Thus, it is within the authority of the commissioner to promulgate rules that make an inmate ineligible to earn statutory good time. To conclude otherwise would render the discretionary nature of § 18-7a (c) superfluous. The habeas court, therefore, appropriately found the directive to be a proper method by which the commissioner may execute his statutory authority.

The petitioners' next contention, that the commissioner adopted and enforced the directive in contravention of the UAPA, is equally without merit. General Statutes § 18-78a, which provides exceptions to the applicability of the UAPA on the department of correction, has been amended by No. 97-168 of the 1997 Public Acts. That public act provides in relevant part: "(a) (1) The provisions of chapter 54 shall apply to the Department of Correction, except that in adopting regulations in regard to riot control procedures, security and emergency procedures, disciplinary action or classification the Department of Correction shall not be required to follow the procedures in sections 4-168, 4-168a, 4-168b, 4-172, 4-173, 4-174 and 4-176. . . . (4) Any regulation, as defined in section 4-166, concerning riot control, security and emergency procedures, disciplinary action, classification or out-of-state transfers which was adopted by the Department of Correction prior to the effective date of this act and which is otherwise valid except that such regulation was not adopted in accordance with chapter 54, is validated, and shall be deemed to have been adopted in compliance with chapter 54."

Those subsections work together to eliminate certain categories of regulations from the UAPA's procedural requirements. In 1997, classification regulations were added to this list, not only prospectively but also retroactively, to validate any procedural defect that may have occurred during the pre-1997 adoption and enforcement of regulations such as Administrative Directive 9.4. Thus, the habeas court properly found that the commissioner's actions were not in violation of the UAPA.

IV

The petitioners next claim that the commissioner's refusal to credit them with statutory good time pursuant to § 18-7a (c) violates their right to equal protection under the law.[12] The petitioners argue that this guarantee was violated by the commissioner's refusal to calculate the duration of the petitioners' terms of incarceration by the same statutory formula that applies to other inmates serving sentences for offenses committed on or after July 1, 1983. See General Statutes § 18-7a (c). The essence of the petitioners' claim is that they have been singled out as a class and, as a result, are being treated differently from inmates remaining in the general population in violation of their right to equal protection under the law.

"It is established that the equal protection provisions of the federal and state constitutions have the same meaning and limitations. . . . When a statutory classification impinges upon an inherently suspect class or affects a fundamental personal right, the statute is subject to strict scrutiny and is justified only by a compelling state interest. . . . Otherwise, a statute will stand if the classification bears a reasonable relation to a legitimate state interest." (Citations omitted; internal quotation marks omitted). *State Management Assn. of*

___

[12] U.S. Const., amend. XIV; Conn. Const., amend. XXI.

*Connecticut, Inc.* v. *O'Neill,* 204 Conn. 746, 750, 529 A.2d 1276 (1987); see *Blakeslee Arpaia Chapman, Inc.* v. *EI Constructors, Inc.,* 239 Conn. 708, 755–56, 687 A.2d 506 (1997).

Inmates given administrative segregation classification are not considered part of a suspect class for the purposes of an equal protection claim and, in distinguishing between classes to award statutory good time, the directive at issue does not intrude upon a fundamental right. "[T]he decision to deny inmates classified as safety threats the opportunity to earn the good time credits specified in § 18-7a (c) does not rise to the level of a constitutionally protected liberty interest." *Abed* v. *Commissioner of Correction,* supra, 43 Conn. App. 181–82. Thus, as long as the administrative segregation classification is rationally related to a legitimate state interest, the petitioners' equal protection claim must fail.

The habeas court found that "[t]he distinction between inmates in administrative segregation and those who are not is founded on an assessment that the former have behaved so poorly in general population that their continued presence in the less restrictive inmate population constitutes a threat to safety and security." We conclude that this distinction between inmates is predicated on a rational basis and that the habeas court properly found no violation of equal protection under the law.

V

The petitioners finally claim that the denial of their statutory good time violated the guarantee of due process of law because they were not given notice and a hearing to determine whether and for how long they would remain ineligible to earn such good time. The petitioners' claim attempts to distinguish between proceedings held to determine inmate classification and

those to determine good time eligibility. It is undisputed that proper administrative segregation classification hearings took place, and the petitioners now challenge the fact that no independent hearing was held to make a determination of good time eligibility in which they claim to have a liberty interest.

Classification in administrative segregation and the loss of eligibility to earn statutory good time are inextricably connected; to lose eligibility to earn good time, an inmate must first be classified in administrative segregation. A proper hearing as to classification necessarily means a proper hearing as to eligibility, as long as the inmate is properly notified of this nexus. Because it is undisputed that the hearing comported with due process as to classification, the petitioners' claim thus becomes: During the classification hearings and the subsequent review of their outcomes, did the petitioners have adequate notice as to whether and for how long they would remain ineligible to earn statutory good time?

We have held that the opportunity to earn statutory good time is not a constitutionally protected liberty interest; id.; therefore, only minimal procedural protections are necessary to satisfy the notice requirement of due process. Id.

We conclude that the petitioners were adequately notified as to whether and for how long they would remain ineligible to earn statutory good time. This notification was accomplished through postings noting the change in the directive, through the directives handbook and through the periodic review of the classification determination, which provided notice as to the duration of the administrative segregation classification. The petitioners knew that an administrative segregation classification would result in the ineligibility to

earn statutory good time and that once classified in administrative segregation, only good conduct and obedience to the prison rules would result in a transfer back to the general population.

The judgments are affirmed.

In this opinion the other judges concurred.