655 A.2d 487

SUNDIATA LUMUMBA, APPELLANT, v. WILLIS
E. MORTON, RESPONDENT.

Superior Court of New Jersey
Appellate Division

Submitted March 7, 1995—Decided March 24, 1995.

Before Judges PRESSLER, LANDAU and NEWMAN.

*Sundiata Lumumba,* appellant *pro se.*

*Deborah T. Poritz,* Attorney General, attorney for respondent (*Mary C. Jacobson,* Assistant Attorney General, of counsel, and *Rhonda S. Berliner,* Deputy Attorney General, on the brief).

The opinion of the court was delivered by

LANDAU, J.A.D.

Sundiata Lumumba is confined at New Jersey State Prison. He appeals an institutional determination, said to represent the "final decision of the Department of Corrections," that labelled two dashiki garments as contraband, not approved for clothing of Main Complex prisoners by the Inmate Handbook published by the Department.

A handbook of internal regulations prohibits shirts that could show "military rank or group membership," and provides that an inmate "may wear only State-issued or institutionally-approved clothing within the prison." Items not specifically listed as approved for possession in the handbook are expressly declared by it as, "*Not* permitted for inmate possession."

Following Lumumba's administrative appeal of an initial decision which prohibited him from possessing the dashikis, he was

advised by the Associate Administrator and the Assistant Superintendent that dashikis are not authorized for inmate retention. This appeal followed. We affirm.

Following the appeal, we denied a motion for summary disposition by the respondent, Administrator Willis Morton, but granted his motion to permit supplementation of the record. In an affidavit thereafter submitted, Assistant Superintendent Roy Hendricks certified that Lumumba has directed where the items should be sent. He further certifies that dashikis are not specifically listed as permitted clothing; that it would be impossible to list all clothing not permitted; and that "even though a particular garment may fit the [generally permitted] description in the handbook, it still may not be permitted in the institution for security reasons."

■ The certification goes on to set forth the State Prison's rationale for the determination under review:

4. A "dashiki" is a loose fitting, often brightly colored, African tunic. It has a V–neck, and is meant to be worn outside the pants rather than tucked in. The colors and design in the fabric are associated with African culture. Thus, a dashiki is ethnic clothing.

5. The institution does not permit any inmate to retain ethnic clothing. This is true whether it is a dashiki or guayabera (ethnic shirt associated with spanish culture), or any other type of ethnic clothing. The reason is that ethnic clothing is in essence a type of uniform. Ethnic clothing leads to the formation of groups and gangs within the prison, which in turn leads to tension and violence. Consequently, ethnic clothing is not permitted within New Jersey State Prison for security purposes.

Lumumba argues that the decision denying him possession of "two shirts based on the cultural distinction of the garments was arbitrary and capricious." More specifically, he says that the dashikis are shirts that do not violate the Inmate Handbook provision as to shirts which reads:

6. shirts—short or long sleeved (no shades of blue or black) are permitted. Shirts with metal snaps, hooks, zippers or any type of fastener other than standard buttons or shirts with quilted linings are not permitted · for inmate retention.

Citing *N.J.A.C.* 10A:18–5.1(a) and 10A:18–5.2(a)[1] respecting receipt and content of packages by inmates, Lumumba urges that no cultural limitations have been promulgated respecting receipt of clothing packages (the dashikis were ordered and arrived by mail), and that an unwritten rule against "ethnic clothing" carries a great potential for arbitrary action. He also ridicules the concept that ethnic clothing can foster gang identification, jeopardize security, or heighten group tensions within a maximum security prison. Instead, he suggests that this conclusion arises from lack of sufficient appreciation of the richness of diverse cultural heritages, recognition of which would strengthen the "fabric of institutional social order." Analogizing such "cultural bias" to racism, Lumumba urges that this "Court ... ferret out genuine threats to institutional order from hypotheses generated by bias," and allow maximum security prisoners to express their respective cultural preferences by affording latitude to purchase their own clothing so their "preferences will readily emerge."

We cannot as readily as defendant leap to the conclusion that the prison's insistence upon unremarkable and relatively uniform clothing for all inmates arises from or amounts to bias. Some penal institutions provide or require use only of prison uniforms. Some, as here, severely limit expressions of individuality, cultural difference, and even religious preference, in prison attire. For varying but sound reasons, military and quasi-military organizations, certain professions, even schools, often impose dress requirements of comparable rigidity.

---

[1] These regulations provide the following:

Inmates shall be informed of new or revised rules and procedures regarding the mailing and receipt of packages by the posting of appropriate notices in each housing area and other areas of the correctional facility. *N.J.A.C.* 10A:18–5.1(a).

(a) Each correctional facility shall promulgate:

1. A written list of items which may be received in a package; and ...

(b) Each inmate shall be given written notice of package limitations as established by (a) above. *N.J.A.C.* 10A:18–5.2(a) and (b).

We do not believe the institutional policy here under attack is selectively aimed at expressions of African ethnicity. Rather, it appears part of a consistently applied policy, made clear throughout the prison handbook and adjusted to changing trends, that inmates be restricted from wearing symbols or indicia of group membership. This administrative expression of a policy which takes into account the need to preserve internal order, discipline, and institutional security is not reversible or modifiable by a court unless illegal, unconstitutional, or wholly arbitrary. *Campbell v. Dept. of Civil Service*, 39 *N.J.* 556, 562, 189 *A.*2d 712 (1963). We find no such defects in the policy, deferring as we must to the administrative expertise that has identified a correlation between institutional encounters and dress which connotes group membership. *See Young v. Lane*, 922 *F.*2d 370 (7th Cir.1991) (prison regulations allowing Jewish inmates to wear yarmulkes only in their cells and at religious services did not violate First Amendment since regulation was reasonable and necessary for prison security); *St. Claire v. Cuyler*, 634 *F.*2d 109, 114 (3rd Cir.1980) (religious head covering prohibition appropriate where head gear could be used for identification with disruptive elements of prison population).

> [T]he problems that arise in the day-to-day operation of a correction facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.... But judicial deference is accorded not merely because the administrator ordinarily will, as a matter of fact in a particular case, have a better grasp of his domain than the reviewing judge, but also because the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial.
>
> [*Bell v. Wolfish*, 441 *U.S.* 520, 547-48, 99 *S.Ct.* 1861, 1878-79, 60 *L.Ed.*2d 447, 474 (1979).]

Provided that the policy is *uniformly* enforced as to all inmates, and nothing in the record suggests that it is not, there is no warrant for our intervention.

As to defendant's assertion that dashikis are expressly permitted by the handbook, we disagree with that interpretation. More-

over, inmates are advised that changing conditions may cause modification in authorized dress.

██ Finally, we agree with the respondent's argument that an internal policy which does not allow maximum security prison inmates to wear distinctive items of ethnic clothing does not have such a substantial impact upon sufficiently important rights or legitimate interests of the regulated parties to require formal APA rulemaking. *N.J.S.A.* 52:14B–2(e); *Woodland Private Study Group v. State,* 109 *N.J.* 62, 74, 533 *A.*2d 387 (1987).

Affirmed.