886 A.2d 585

**Richard L. MASSEY, Jr.**

**v.**

**SECRETARY, DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONAL SERVICES.**

**No. 142, Sept. Term, 2004.**

Court of Appeals of Maryland.

Nov. 21, 2005.

Joseph B. Tetrault (Stephen Z. Meehan, Pauline K. White, Tamal A. Banton, Prisoner Rights Information System of Maryland, Inc., Charterstown, on brief), for appellant.

Michael O. Doyle, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellee.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

WILNER, J.

The State Department of Public Safety and Correctional Services (DPSCS) and the Division of Correction (DOC), a unit within the Department, have adopted certain "directives" that (1) create and define administrative offenses for which DOC inmates are subject to administrative discipline, (2) prescribe the kinds of discipline, including the revocation of earned diminution credits against the inmate's sentence, available upon a finding of guilt, (3) set forth the procedure for charging inmates with offenses, adjudicating their guilt or innocence of those offenses, and imposing discipline, and (4) establish procedures for receiving, considering, and adjudicating complaints made by inmates regarding policies, procedures, and conditions in the prison.

The question before us is whether certain of those directives constitute regulations that must be adopted in conformance

with the State Administrative Procedure Act. We shall answer that question in the affirmative, and, because it is undisputed that they were not so adopted, we shall declare them ineffective.

## BACKGROUND

### Procedural Construct

The State prison system is under the direction and control of DOC which, as noted, is a unit within DPSCS. Subject to the authority vested by law in the Secretary of DPSCS, the Commissioner of Correction is in charge of DOC. *See* Maryland Code, § 3–203 of the Correctional Services Article (CS). CS § 2–109(c) requires the *Secretary* to adopt regulations to govern the policies and management of correctional facilities in the Division of Correction in accordance with Title 10, Subtitle 1 of the State Government Article but excepts from that requirement "a guideline pertaining to the routine internal management of correctional facilities in the Division." CS § 3–205 authorizes the *Commissioner* to adopt regulations for the operation and maintenance of the units in DOC and requires that the regulations "shall provide for . . . the discipline and conduct of inmates, including the character of punishments for violations of discipline." There is no exemption in § 3–205 from the requirements of title 10, subtitle 1 of the State Government Article (SG).

SG, title 10, subtitle 1 (which comprises §§ 10–101 through 10–117) is the part of the State Administrative Procedure Act dealing with the adoption of regulations. It applies to every unit in the Executive Branch of the State Government, unless otherwise expressly provided by law. SG § 10–102. Neither DOC nor DPSCS is exempted, so the subtitle applies to both the Department and the Division.[1]

---

1. In an attempt to escape from the requirements of the APA, DPSCS sponsored a departmental bill in the 2005 Session of the General Assembly which would have amended CS § 2–109(c)(2) to provide that the requirement of compliance with SG, title 10, subtitle 1 did not apply to the classification, discipline, or conduct of DOC inmates. *See* HB

The term "regulation" is defined in SG § 10–101(g)(1) as a statement, or amendment or repeal of a statement, that (1) has general application and future effect, (2) is adopted (i) to detail or carry out a law that the unit administers, (ii) govern the organization or procedure of the unit, or (iii) govern practice before the unit; and (3) is in any form, including a guideline, rule, standard, statement of interpretation, or statement of policy. Section 10–101(g)(2) excludes from the definition, among other things not relevant here, "a statement that . . . concerns only internal management of the unit [ ] and . . . does not affect directly the rights of the public or the procedures available to the public."

SG, title 10, subtitle 1 imposes procedural requirements on the adoption of regulations. With certain exceptions for emergency regulations, it requires that the unit (1) submit a proposed regulation to the Attorney General or unit counsel for approval as to legality (§ 10–107), (2) submit the proposed regulation to the General Assembly's Joint Committee on Administrative, Executive, and Legislative Review (AELR Committee) at least 60 days prior to adoption (§§ 10–110, 10–112), (3) publish the proposed regulation in the Maryland Register at least 45 days prior to adoption (§ 10–111), and (4) after adopting a regulation, submit the full text of the regulation to the Administrator of the Division of State Documents for publication in the Maryland Register and the Code of Maryland Regulations (COMAR) (§ 10–114). A regulation is not effective until each of those requirements has been met. SG § 10–117.

Pursuant to their respective authority under CS §§ 2–109 and 3–205, the Secretary and the Commissioner have adopted a number of regulations in accordance with SG, title 10, subtitle 1; they appear in COMAR, title 12, subtitle 2. Most of the rules governing the operation of the State correctional facilities, however, and especially those dealing with inmates, are in the form of "directives" adopted either by the Secretary

782 (2005). The bill received an unfavorable report by the House Judiciary Committee and therefore did not pass.

(DPSCSDs) or by the Commissioner (DCDs) without any pretense of compliance with SG, title 10, subtitle 1. Those directives—seven substantial volumes of them—were promulgated "to establish formal written policy and procedures relating to all aspects of correctional administration and operation." DCD 1–3. We are concerned principally with DPSCSD 105–4 and 105–5 and, to a lesser extent in this case, with DCD 185–001 through 185–403, which are applicable to all institutions within the Division.

DPSCSD 105–5 does two things. First, in an appendix, the directive defines the kind of conduct that will subject inmates to discipline. Fifty-seven offenses are listed, divided into five categories of seriousness. Category I offenses include such things as engaging in disruptive activities, committing acts of violence, and possessing weapons or other dangerous contraband. Category II offenses mostly involve refusals by inmates to participate in activities that result in their removal from certain programs. Category III offenses include gambling, theft, and the possession of certain somewhat less dangerous contraband. Category IV offenses include disobeying a direct lawful order, refusing to work, giving false information, making unauthorized phone calls, and possessing any other kind of contraband; and Category V offenses include such things as failing to display one's identification badge, engaging in horseplay, and failing to maintain personal cleanliness.

DPSCSD 105–5 also prescribes a procedure for charging offenses. It requires a prompt investigation of conduct that might constitute an offense, preparation of a "rule violation report" containing certain information, review of the report by a supervisor, the shift supervisor, and, if administrative segregation is recommended as a punishment, by the shift commander. Under DPSCSD 105–4, the shift supervisor, if convinced that there is only a Category IV or V violation, may prepare an "incident report" rather than a "rule violation report" and offer the inmate an informal disposition. An Appendix to DPSCSD 105–4 lists the possible sanctions available for an informal disposition, ranging from a reprimand, to

loss of certain privileges, to cell restriction for up to one month. The inmate may accept the informal disposition by signing the notice or may reject it and opt for a hearing.

If the inmate either is not offered an informal disposition or rejects one, he or she is served with a formal Notice of Inmate Rule Violation and Disciplinary Hearing. DPSCSD 105–5 sets forth the procedures for a hearing before a DOC hearing officer—when an inmate may be found to have waived a hearing, when charges may be dismissed on preliminary review, the authority of a hearing officer to offer an informal disposition, the applicable standard of proof, consideration of an inmate's request for representation or for the attendance of witnesses, preliminary motions, requests for postponement, taking a plea to the charge, the kind of evidence that may be admitted, presentation of a defense, fact-finding and decision by the hearing officer, and imposition of a sanction. The directive also provides for an appeal to the warden, review by the warden, and the options available to the warden.

DPSCSD 105–4, in addition to providing for an initial offer of informal disposition, sets forth a matrix of punishments for the various offenses, taking into account the category of the offense, the inmate's prior rule-violation history, any aggravating and mitigating circumstances involved in the instant violation, and the inmate's adjustment history. Sanctions may include segregation, cell restriction, revocation of good conduct and special project program credits (diminution credits), and loss of visitation and other privileges for various periods of time. Some of those penalties are mandatory for certain offenses. Revocation of diminution credits is expressly authorized by CS § 3–709(a) and will usually result in an increase in the inmate's period of incarceration.[2] A finding of a violation, whatever the sanction, may also directly or indirectly

2. CS § 3–709(a) provides that, "[i]f an inmate violates the applicable rules of discipline, the Division may revoke a portion or all of the diminution credits awarded under §§ 3–704 (good conduct) and 3–707 (special projects) of this subtitle according to the nature and frequency of the violation."

affect an inmate's chance for parole or the sanction to be imposed in the event of any further violation.

The DCD 185 series of directives deal with the processing of inmate complaints about prison policies, procedures, and conditions—such things as medical services, access to courts, religious liberties, lost, damaged, stolen, or confiscated property, use of force, conditions affecting an inmate's health, safety, and welfare, and the administration of the Administrative Remedy Procedure. *See* DCD 185–002. It is not available to protest classification, parole, or adjustment (offense) decisions but may be used to pursue complaints of formal or informal reprisals. *Id.*

DCD 185–100 provides for three aspects of the Administrative Remedy Procedure—an informal resolution procedure, a formal complaint to the warden for investigation and resolution at the headquarters level, and a formal appeal of an adverse decision by the warden to the Commissioner. Remedies available include a written change in the substance, interpretation, or application of a policy, rule, or procedure. *See* Appendix 1 to DCD 185–100. A formal complaint is initiated by the filing of a Request for Administrative Remedy on a form attached as an appendix to DCD 185–100. An administrative remedy coordinator is required to process all formal complaints, and investigators are responsible for the timely and sufficient completion of an investigation on each assigned complaint.

The warden may dismiss a request upon determining that it is frivolous or malicious. DCD 185–002 limits the number of requests for administrative remedy that an inmate may file to five a month and authorizes the warden to administratively dismiss any request not determined to be an emergency that is in excess of that limit. A decision by the warden may be appealed to the Commissioner. A final decision by the Commissioner exhausts the DOC Administrative Remedy Procedure. Further administrative review lies with the Inmate Grievance Office.

The Inmate Grievance Office (IGO) is a statutory unit within DPSCS. *See* CS § 10–202. After exhausting the Administrative Remedy Procedure provided by DOC, an inmate who has a grievance against an official or employee of DOC may submit a complaint to IGO. If, after preliminary review, the IGO Executive Director concludes that the complaint is "wholly lacking in merit on its face," the complaint may be dismissed without a hearing and without making specific findings of fact. CS § 10–207(b). Such an order constitutes the final decision of the Secretary for purposes of judicial review. *Id.* Absent such a conclusion, the complaint is referred to the Office of Administrative Hearings for a hearing before an Administrative Law Judge (ALJ) in conformance with the procedures set forth in CS § 10–208. The ALJ may dismiss a complaint as "wholly lacking in merit," and that, too, will constitute the final decision of the Secretary for judicial review purposes. CS § 10–209(b)(1). Otherwise, the ALJ prepares a proposed order for review by the Secretary. CS § 10–209(b)(2). The inmate is entitled to seek judicial review from any final decision of the Secretary. CS § 10–210.

### *Massey's Complaint*

On June 19, 2002, appellant Massey, then an inmate at the Western Correctional Institution in Cumberland, submitted a Request for Administrative Remedy to the warden of that institution. The handwritten request was as follows:

"Current Dept. of Public Safety and Correctional Services directives (DPSCSDs) pertaining to disciplinary rules, procedures and sanctions have been and remain adopted by [the] Commissioner of Correction, in violation of the Maryland Administrative Procedure Act (APA), State Government Article (SG), Title 10, Subtitle 1. Said regulations are unlawful, *and I am currently being punished, i.e., serving additional prison time, as a result.* (My complaint is singular—the regulations are unlawful and violate my interest in fairness).

I request prompt corrective action and any appropriate damages and attorney fees, etc. in the event of future litigation."

(Emphasis added).

On or about June 24, the Institutional Coordinator, apparently acting for the warden, dismissed the request on the ground that Massey had exceeded the monthly limit of five requests. In accordance with DCD 185–100, Massey appealed to the Commissioner who, on July 1, 2002, dismissed the appeal after concluding that the Institutional Coordinator properly dismissed the complaint pursuant to DCD 185–205. We infer from that response that the Commissioner rejected the appeal because Massey had exceeded the five requests/month limit allowed by that DCD.

In accordance with CS § 10–206, Massey submitted a grievance to IGO. He stated his grievance to be that "DCD 185–002, which restricts the number of administrative complaints, is both unconstitutional and ineffective per the Administrative Procedure Act (State Gov't Art., § 10–113)." He made clear in Attachments that the basis of his complaint was that the directive that contained the five requests/month limitation had not been validly adopted. On August 27, 2002, the Executive Director administratively dismissed the appeal as "being on its face wholly lacking in merit." He did not base his rejection of the appeal on the five requests/month limitation, however, and, indeed, stated that it would not be necessary to address "the procedural issue associated with the dismissal of your ARP [Request for Administrative Remedy] complaint because I am prepared to address the substantive issue." In that regard, he stated:

> "Not only did your original ARP complaint fail to adequately set forth a specific complaint, but more importantly the general basis which you referred to was erroneous. While the documents you mentioned (e.g. disciplinary rules, etc) were properly referred to as 'directives', you later erroneously referred to them as 'regulations' as falling under the

Maryland Administrative Procedure Act. 'Directives' and 'Regulations' are two separate and distinct entities."

Clearly implicit in that ruling is IGO's determination that the directives issued by the Secretary—at least those applicable to Massey's complaint and grievance—were not regulations as defined in the APA and did not need to be adopted as such. Massey then filed a petition for judicial review in the Circuit Court for Allegany County. He argued to that court that his complaint was specific, that he challenged the validity of directives that subjected him to increased punishment and restricted his access to the courts, that the directives qualified as regulations that had to be adopted in accordance with the APA, and that they did not constitute guidelines as to routine internal management. The State's response was that the DPSCSD 105–4 and 105–5 concerned only internal management and did not affect directly the rights of the public or procedures available to the public, and that they therefore did not have to be adopted in conformance with SG, title 10, subtitle 1.

After a hearing, at which Massey appeared (as he had throughout) without counsel, the court, on March 10, 2003, entered an order affirming the IGO decision. No reasons were given. Massey then filed an application for leave to appeal to the Court of Special Appeals. That court eventually granted the application and transferred the case to its regular docket, but, before argument, we granted *certiorari* on our own initiative to review the two issues raised in Massey's brief—whether the directives relevant to this case are subject to SG, title 10, subtitle 1, and whether the IGO should have set the matter in for hearing. We need not address the second issue.

## DISCUSSION

### *The Issue Before Us*

The first thing we need to do is determine more precisely what is before us. Massey filed a request for administrative remedy pursuant to the DCD 185 series. He was thus

invoking a "directive" adopted by the Commissioner pursuant to CS § 3–205. His complaint was that he had been subjected to discipline and had lost diminution credits pursuant to the substantive and procedural provisions of DPSCSD 105–4 and 105–5, which he believed to be invalid, in part, at least, because they had not been adopted in conformance with the APA. His initial challenge, as he made clear, was not to whether he was guilty of an infraction that called for the discipline imposed but only to the Secretary's directives pursuant to which the matter was adjudicated.

Massey's complaint was dismissed by the Institutional Coordinator and ultimately by the warden solely because he had exceeded the five requests/month limit established in DCD 185–002. That was not the basis for the dismissal of his complaint by the IGO, however. The IGO expressly did not reach the procedural impediment issue but instead ruled on the merits of Massey's initial request, holding that DPSCSD 105–4 and 105–5 were not regulations that needed to be adopted in conformance with the APA and that they were therefore valid and effective.

Judicial review in this instance is of the IGO decision, which was a summary dismissal and, under CS § 10–207(b)(2)(ii), constituted the final decision of the Secretary. *See* CS § 10–210(b) ("The complainant is entitled to judicial review of the final decision of the Secretary under § 10–207(b)(2)(ii) . . . of this subtitle."). The final decision of the Secretary, in other words, was that DPSCSD 105–4 and 105–5 were not regulations that needed to be adopted in conformance with the APA. We are therefore not concerned here with the application or validity of the DCD 185 series, but only whether DPSCSD 105–4 and 105–5 are legally effective.

The State does not contest that DPSCSD 105–4 and 105–5 fall within the definition of "regulation" in SG § 10–101(g)(1), and clearly that is the case.[3] They constitute statements that

---

3. It is important to note that we are not dealing here with all of the directives issued by the Secretary, but only those applicable in this

have general application throughout all of the correctional institutions in DOC and apply to all inmates in those institutions; they have future effect; they were adopted by a "unit" to carry out laws that the unit administers; and they are in the form of rules, standards, statements of interpretation, and statements of policy.

The only defense posed by the State is that the Secretary is excused from complying with the procedural requirements of SG title 10, subtitle 1 because (1) the directives concern "only internal management of the unit [and do] not affect directly the rights of the public or the procedures available to the public" and therefore are excluded by SG § 10–101(g)(2) from the definition of "regulation," and (2) they constitute a "guideline pertaining to the routine internal management of correctional facilities in the Division of Correction" and, even if deemed to be a regulation under SG § 10–101(g), they need not be adopted in conformance with SG, title 10, subtitle 1 by virtue of CS § 2–109.

As to both provisions, the State's position is that the Secretary's directives govern how DOC maintains order and manages the inmate population, which are matters of internal management for which great flexibility is required. It refers, in that regard, to some of the more mundane provisions, such as how the correctional staff is to prepare notices of disciplinary infractions and the manner in which inmates may waive a hearing. Massey points out, of course, that the directives do a great deal more than that—that they define both the substantive and procedural construct under which inmates may have their incarceration extended and thus affect Constitutionally-protected liberty interests. Both parties cite out-of-State cases to support their respective positions.

---

case—DPSCSD 105–4 and 105–5. We do caution the Secretary and the Commissioner to review very carefully all of the directives that they have issued, however, and determine, at least from their perspective, whether, in light of this Opinion, they need to be adopted in the form of regulations.

### Authority of the Secretary

■ Before we address the particular arguments of the parties, we need to consider a more fundamental matter that bears directly on the validity, rather than merely the effectiveness, of the two directives. DPSCSD 105–4 and 105–5 are directives adopted by the *Secretary*, presumably pursuant to CS § 2–109(c). They are not directives adopted by the *Commissioner* pursuant to CS § 3–205. That is why, in clear contrast to the DCD 185 series and many other DCDs in the seven volumes of directives, they are denominated as DPSCSD (Department of Public Safety and Correctional Services Directives) rather than DCD (Division of Correction Directives). A preliminary question thus arises whether, if DPSCSD 105–4 and 105–5 are, indeed, guidelines that pertain only to "the routine internal management of correctional facilities in the Division of Correction," as the State so ardently contends, the Secretary had any statutory authority to adopt them.

CS § 2–109 states, in full:

"(a) *Office of Secretary.*—The Secretary shall adopt regulations for the office of the Secretary.

(b) *Review of regulations of units.*—(1) The Secretary shall review regulations proposed by a unit in the Department.

(2) The Secretary may approve, disapprove, or revise regulations proposed by a unit in the Department.

(c) *Correctional facilities.*—(1) Except as provided in paragraph (2) of this subsection, the Secretary shall adopt regulations to govern the policies and management of correctional facilities in the Division of Correction in accordance with Title 10, Subtitle 1 of the State Government Article.

(2) Paragraph (1) of this subsection does not apply to a guideline pertaining to the routine internal management of correctional facilities in the Division of Correction."

In presenting its argument, the State necessarily assumes a rather limited construction of subsection (c)(2)—that it simply

means that regulations adopted by the Secretary pursuant to subsection (c)(1) that pertain to the routine internal management of DOC correctional facilities need not comply with the regulation-making requirements of the APA. That is not the construction we perceive, however. Both the language of subsection (c)(2) and the immediate legislative history of that subsection, especially when read in harmony with CS § 3–205, lead rather to the conclusion that regulations that pertain only to the routine internal management of DOC facilities are to be adopted by the *Commissioner* and not by the *Secretary*. The Secretary has the power to approve, disapprove, or revise proposed regulations of the Commissioner, but there is no clear grant of authority to adopt internal management regulations as regulations of the Secretary.

Subsection (c)(2) states that paragraph (1) "does not apply" to routine internal management guidelines. It is paragraph (1), however, that is the source of the Secretary's authority to adopt regulations for the management of DOC facilities in the first instance, and if that paragraph "does not apply" to routine internal management guidelines, there would seem to be no authority for the Secretary to adopt such guidelines. That impediment is even more apparent from the legislative history of the provision.

The Revisor's Note to CS § 2–109 states that it was derived "without substantive change" from former Art. 41, § 4–104(b) and (h). Former § 4–104(b) made the Secretary responsible for promulgating regulations "for his office" and empowered the Secretary to approve, disapprove, or revise regulations of the various units in the Department. Section 4–104(h) was the direct predecessor of CS § 2–109(c). It contained three paragraphs:

"(1) [The Secretary] shall adopt regulations governing the policies and management of correctional facilities within [DOC].

(2) Except as provided in paragraph (3) of this subsection, and notwithstanding the provisions of § 10–101(e)(2)(i) of the State Government Article, the regulations described in

paragraph (1) of this subsection shall comply with Title 10, Subtitle 1 of the State Government Article (Administrative Procedure Act—Regulations).

(3) The requirements of *paragraphs (1) and (2) of this subsection* do not apply to guidelines pertaining to the routine internal management of correctional facilities within [DOC]."

(Emphasis added).

Section 4–104(h)(3) could not be clearer: neither ¶ (1) nor ¶ (2) applied to routine internal management guidelines. It was not just compliance with the APA requirements—subsection (h)(2)—that was exempted; the authority conferred in subsection (h)(1) to adopt regulations also was inapplicable to routine internal management guidelines. All that the code revision of that section did was to combine what had been paragraphs (h)(1) and (h)(2) into one paragraph— § 2–109(c)(1)—without any substantive change.

■■ There is nothing illogical about such a construction. The law gives the Commissioner control over the management of the prisons within DOC and specifically gives the Commissioner independent authority in CS § 3–205 (and its predecessor, Art. 27, § 676) to adopt regulations for the operation and maintenance of the facilities within DOC, including the discipline and conduct of inmates. Routine internal management is left to the Commissioner and is not to be micro-managed by the Secretary.[4] Accordingly, if the State is correct in its

---

4. We are aware of CS § 2–113 which, with exceptions not relevant here, authorizes the Secretary to "exercise any power, duty, responsibility, or function of any unit, unit head, or appointing officer in the Department." If the Legislature had not, in CS § 2–109(c), dealt specifically with regulations concerning the routine internal management of DOC facilities and expressly withdrew the power from the Secretary to issue regulations of that kind, § 2–113 would most likely permit the Secretary to adopt such regulations. The question is one of legislative intent, and we have long followed the rule that, when there is a conflict between a general statute and one dealing specifically with the issue at hand, the specific statute controls. See *Smack v. Dept. of Health*, 378 Md. 298, 306, 835 A.2d 1175, 1179–80 (2003) and cases cited there. "[W]here the statute to be construed is a part of an entire

vigorous assertion that DPSCSD 105–4 and 105–5 are merely guidelines pertaining to the routine internal management of the DOC correctional facilities, they are *ultra vires* and invalid for that reason. The fact is, however, that those directives are *not* merely guidelines pertaining to internal management, routine or otherwise. Both the nature and the history of those directives make that clear.

### *Internal Management*

In 1970, eighty-two DOC inmates, after being transferred from medium and minimum security facilities to the segregated confinement unit at the Maryland Penitentiary, filed suit in U.S. District Court, complaining about the procedures used to implement the transfer and the additional punishment meted out to them.[5] The court agreed with the thrust of the

statutory scheme, construction of the provisions of the scheme must be done in the context of that scheme. When, in that context, two statutes conflict and one is general and the other specific, 'the statutes may be harmonized by viewing the more specific statute as an exception to the more general one.' " *Id.* at 306, 835 A.2d at 1179 (citations omitted) (quoting *Government Employees Ins. Co. v. Insurance Comm'r*, 332 Md. 124, 133, 630 A.2d 713, 718 (1993)). *See also State v. Ghajari*, 346 Md. 101, 116, 695 A.2d 143, 150 (1997).

5. Seventy-two of the inmates were transferred from the Maryland House of Correction by reason of their alleged involvement in a non-violent work stoppage that was called to protest medical conditions at the prison and the punishment of eight inmates who had complained about those conditions. After the work stoppage had continued for three days, correctional officials decided to transfer a large number of inmates to the Penitentiary. Two officers were directed to prepare lists of those to be transferred. Those on the lists were brought before a disciplinary board consisting of three persons, including one of the officers who compiled the lists. They were not advised in advance of any charge, nor, until a few hours before, the time of the "hearing." Seventeen of the 72 inmates were notified at the "hearing" that they were being transferred because of specific acts of misconduct; the other 55 were told that they were being transferred because they were not "amenable to the program security level" at the House of Correction. The inmates were permitted to respond but were not allowed representation, the right to confront their accusers, or the right to call witnesses in their defense. The only evidence consisted of the written reports of the correctional officers. The 17 charged with specific misconduct were indefinitely confined in the segregation unit at the

prisoners' complaint and concluded, as a matter of Federal due process requirements, that, when the loss of diminution credits was at risk, the inmates were entitled to notice of the charges against them and a fair hearing on those charges, and that the procedures used by DOC were Constitutionally deficient. *See Bundy v. Cannon,* 328 F.Supp. 165 (D.Md.1971). Following announcement of the court's intention to enter an order providing relief, DOC agreed to adopt new procedures that had been drafted by *amicus* in the case and that were attached as an appendix to the court's opinion. *Id.* at 174–77. Those procedures, which defined and dealt with both minor and major violations, were obviously intended, and were regarded by the court, as minimally necessary to bring DOC into compliance with the due process requirements enunciated by the court. The initial procedures were amended pursuant to consent orders on two subsequent occasions. *See Bundy v. Cannon,* 453 F.Supp. 856 (D.Md.1978) and *Bundy v. Cannon,* 538 F.Supp. 410 (D.Md.1982). *See also* Michael A. Millemann, *Prison Disciplinary Hearings and Procedural Due Process— The Requirement of a Full Administrative Hearing,* 31 Md. L.Rev. 27 (1971). They are the predecessors of DPSCSD 105–4 and 105–5.

The due process underpinning of the *Bundy* procedures, at least when the revocation of earned diminution credits is at risk, was confirmed by the Supreme Court in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). The Court there held that, where a State provides for diminution credits and their revocation, a due process liberty interest is

Penitentiary and they lost 105 days of good conduct credit. The situation with respect to the ten inmates transferred from the minimum security facility, due to a work stoppage and formation of an unauthorized inmate association, was similar.

At the time, there was no handbook setting forth any detailed prison rules. There was a published list of ten general rules of conduct and a list of possible sanctions for the violation of those rules. In addition, there was an administrative directive setting forth administrative adjustment procedures for disciplining inmates due to infractions and for transferring them because of their inability to adjust to lesser security status. *See Bundy v. Cannon,* 328 F.Supp. 165, 168–70 (D.Md.1971).

triggered—that "the State having created the right to good time and itself recognizing that its deprivation is a sanction authorized for major misconduct, the prisoner's interest has real substance and is sufficiently embraced within Fourteenth Amendment 'liberty' to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated." *Id.* at 557, 94 S.Ct. at 2975, 41 L.Ed.2d at 951. *Compare Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) (no liberty interest involved in transfer of inmate to maximum security prison) and *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995) (placement of inmate in segregated confinement did not trigger due process liberty interest).[6]

The first *Bundy* case was decided within a year after the creation of the Department of Public Safety and Correctional Services as a principal department of the State Government and the reorganization of the structure and governance of the State correctional system. *See* 1970 Md. Laws, ch. 401. At the time, Maryland Code, Art. 41, § 204C (b) authorized the Secretary to promulgate "rules and regulations for his office" and to review, approve, disapprove, or revise the "rules and regulations" of all of the units in the Department, including DOC. Art. 41, § 204D(a) created DOC, to perform the functions and exercise the powers previously vested in the Department of Correctional Services. The office of Commissioner of Correction was created by Art. 27, § 673. Section 676 of that article authorized the Commissioner to adopt "rules and regu-

---

**6.** In *Sandin,* the Court reviewed its past decisions regarding prison disciplinary regulations and procedures and reaffirmed the approach it had taken in *Wolff* that "States may under certain circumstances create liberty interests which are protected by the Due Process Clause. But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin, supra,* 515 U.S. at 483–84, 115 S.Ct. at 2300, 132 L.Ed.2d at 429–30 (citations omitted).

lations, not inconsistent with law, for the operations and maintenance of the several institutions and agencies in the Department, for the discipline and conduct ... of prisoners, and for the duties, discipline and conduct of officers and employees of the several institutions and agencies." There was nothing in any of those statutes that created any distinction between "rules" and "regulations" or between rules or regulations that concerned only "internal management" and those that had a broader reach.[7] Nor, although likely implicit, was there any specific mandate that rules or regulations be adopted in conformance with other statutory procedural requirements.

Requirements for the adoption of regulations were much less rigorous then than they are now. Art. 41, § 9 required an agency to submit proposed regulations to the Attorney General for approval as to legality; § 245(c) of that Article required the agency, prior to adoption, to publish or otherwise circulate a proposed regulation and afford interested persons an opportunity to comment on them, orally or in writing; and § 246 required the agency to file a certified copy of the regulation with the Clerk of the Court of Appeals, the Secretary of State, and certain other depositories.

Although we may presume from the fact that the Attorney General represented the State in the *Bundy* case that he approved the agreed-upon procedures attached as an Appendix to the court's opinion, there is no indication that the Secretary or the Commissioner complied with any of the other requirements then in the law. The Clerk of this Court has no record of a certified copy of the procedures being filed. Perhaps the Secretary and the Commissioner assumed that, as

---

7. The APA in effect at the time, adopted initially in 1957 and substantially rewritten in 1961, used the term "rule," rather than "regulation," but "rule" was defined as including a regulation and essentially as "regulation" is now defined. *See* 1957 Maryland Code, Art. 41, § 244(c) (1982 Repl.Vol.). The definition, as it had since the 1957 enactment, excluded from its scope "regulations concerning only the internal management of the agency and not directly affecting the rights of or procedures available to the public."

the procedures formed part of a Federal court order, it was not necessary to comply with State statutory requirements, minimal though they were.

The new requirements for adopting regulations were enacted in 1972 and 1974. The 1972 law (1972 Md. Laws, ch. 699) created the AELR Committee and required that agencies, at least 30 days prior to the adoption of any "rule, regulation, or standard," submit a copy to the committee. The 1974 Act—the State Documents Law (1974 Md. Laws. ch. 600)—created COMAR and the Maryland Register and required agencies to send a copy of any proposed rule or regulation to the Administrator of State Documents at least 60 days prior to adoption, for publication in the Maryland Register. The current organization and terminology of the APA provisions were enacted as part of the State Government Article—a Code Revision product—in 1984. *See* 1984 Md. Laws, ch. 284.

The current versions of DPSCSD 105–4 and 105–5 were adopted in January, 2002. Although the Secretary and the Commissioner are obviously still bound to respect the due process requirements enunciated in *Bundy, Wolff,* and *Sandin,* it seems clear that those directives were not adopted pursuant to, and did not become part of, any extant Federal court order. There is no indication that they were ever submitted to or approved by the Federal court. They are purely State regulations. Nonetheless, the fact that they proceeded from, and were designed to implement, basic Federal due process requirements is powerful evidence that they are not merely guidelines for routine, or even non-routine, internal management, subject to change at the whim of the Secretary or the Commissioner. At least where discipline may serve to lengthen an inmate's period of incarceration or subject an inmate to other "atypical" punishment, regulations of that kind are required to protect the Constitutionally-based liberty interest of prisoners. Neither the Secretary nor the Commissioner could simply abrogate them and put nothing in their place, or amend them in a manner as would cause them not to provide the Constitutionally-required protection.

The Court of Special Appeals essentially confirmed that view in *Hopkins v. Md. Inmate Griev. Comm'n,* 40 Md.App. 329, 391 A.2d 1213 (1978), *cert. dismissed sub nom., Secretary v. Hopkins,* 285 Md. 120 (1979). At issue there was a predecessor of DPSCSD 105–5, requiring that an inmate charged with a rule violation be afforded a hearing within 72 hours after the alleged infraction unless prevented by exceptional circumstances. The hearing afforded Hopkins occurred five days, rather than three days, after the infraction. IGO rejected Hopkins' complaint, holding that the delay was justified by exceptional circumstances and was not prejudicial, and the Circuit Court, on judicial review, affirmed that decision.

The Court of Special Appeals concluded that the record did not support a finding of exceptional circumstances and that the time requirement was not merely directory, but was mandatory. Applying then the principle enunciated in *U.S. ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954), the court held it to be well-established, as a general rule, that regulations adopted by an administrative agency cannot be waived, suspended, or disregarded in a particular case so long as those regulations remain in force. The court recognized that there were exceptions to that general principle, one of which was an agency's departure from "procedural rules adopted for the orderly transaction of agency business." *Hopkins, supra,* 40 Md.App. at 336, 391 A.2d at 1217. It concluded, however, that the regulation at issue was not of that type:

> "It is clear that [DOC Rule 105–2(c)(1)], which is couched in unambiguous, mandatory language, was not intended to govern internal agency procedures but was specifically adopted to confer important procedural benefits and safeguards upon inmates...."

*Id.* at 337, 391 A.2d at 1217.

We dealt with an allied matter in *Pollock v. Patuxent,* 374 Md. 463, 823 A.2d 626 (2003). At issue was a directive adopted by Patuxent Institution, a correctional institution that is not part of DOC and that adopts its own directives, dealing

with the handling of urine specimens collected from inmates. We expressly adopted the "*Accardi* doctrine," that an agency must ordinarily comply with the rules and regulations that it has adopted, along with the exception recognized in *Hopkins* permitting departures from "procedural rules adopted for the orderly transaction of agency business," although, in contrast to one of the pronouncements in *Hopkins,* we held that, to be entitled to relief by reason of an unauthorized departure, the claimant must show prejudice. In discussing *Accardi* and its progeny, we pointed out that, as a minimum, an agency's failure to comply with its own regulations "automatically nullifies its action where the regulation is promulgated to affect fundamental rights derived from the Constitution or a federal statute" and that nullification had been required even when " 'less fundamental' " rights were involved. *Pollock, supra,* at 489, 823 A.2d at 642.

Our ultimate conclusion was that, in determining whether the "*Accardi* doctrine" applies, a court must

> "scrutinize the agency rule or regulation at issue to determine if it implicates *Accardi* because it 'affects individual rights and obligations' or whether it confers 'important procedural benefits' or, conversely, whether *Accardi* is not implicated because the rule or regulation falls within the ambit of the exception which does not require strict agency compliance with internal 'procedural rules adopted for the orderly transaction of agency business,' *i.e.,* not triggering the *Accardi* doctrine."

*Id.* at 503, 823 A.2d at 650.

We are not dealing here, of course, with *Accardi,* but the analysis is pertinent in its distinction between regulations that affect "fundamental rights," especially those that are Constitutionally derived, and those governing merely the "orderly transaction of agency business." The clear implication is that, if the regulation in question affects fundamental rights, it is *not* one that can be characterized as for the orderly transaction of agency business and thus not one that pertains only to routine internal management.

An exemption from many of the requirements for adopting regulations that pertain only to the internal management of an agency has been part of the Model APA for nearly five decades and appears in the law of nearly every State that has adopted a version of the Model APA. Although there have been many cases determining whether a particular rule or regulation falls within the ambit of the exemption, there has been surprisingly little comment on the general meaning and scope of that exemption.

The few commentators who have addressed the matter agree that the exemption was a pragmatic and balanced one— that to carry the procedural rule-making requirements "too far into the internal workings of the agency would completely stifle agency activities if it were enforced." *See* Gary M. Haman & Robert P. Tunnicliff, *Idaho Administrative Agencies and the New Idaho Administrative Procedure Act,* 3 IDAHO L.REV. 61, 79 (1966); *see also* Arthur Earl Bonfield, *The Iowa Administrative Procedure Act: Background, Construction, Applicability, Public Access To Agency Law, The Rule-making Process,* 60 IOWA L.REV. 731 (1975) [hereinafter Bonfield, *The Iowa Administrative Procedure Act* ]; ARTHUR EARL BONFIELD, STATE ADMINISTRATIVE RULE MAKING § 6.17.2 (1986 & Supp.1993); Carl A. Auerbach, *Administrative Rulemaking in Minnesota,* 63 MINN. L.REV. 151, 241–42 (1979). Bonfield noted the inefficiency and expense of requiring agencies to comply with the statutory requirements "every time they gave an instruction of any sort to their employees, no matter how internal," and pointed out, as well, that the public benefit "would be doubtful because the public is not really affected in any cognizable way by a large portion of the agencies' internal housekeeping matters." Bonfield, *The Iowa Administrative Procedure Act, supra,* at 833. Bonfield also observed, however:

> "On the other hand, agencies could too easily subvert public rulemaking requirements if they could avoid those procedures for *anything* they called an internal directive to staff. After all, the public's rights can as easily be defined by statements formally addressed to the agency staff—'Punish

any person who litters a public park'—as by statements formally addressed to the public—'Any person who litters a public park will be punished.' "

*Id.*

In his book, Bonfield viewed the internal management exclusion as "a very narrowly drawn provision with several important qualifications." Arthur Earl Bonfield, State Administrative Rule Making § 6.17.2, at 402. It is meant, he asserts, "to assure that matters of internal agency management *that are purely of concern to the agency and its staff* are effectively excluded from normal rule-making and rule-effectiveness requirements." *Id.* (Emphasis added). In his law review article, Bonfield agreed that "no exclusion will be allowed if the agency statement substantially affects rights of the public of a sort that are cognizable as a matter of law; that is, rights which are normally enforceable against the agency or other parties through legal processes." Bonfield, *The Iowa Administrative Procedure Act, supra,* at 834. The kinds of statements falling within the ambit of the exemption, he concluded, "face inwards" and do not "substantially affect any legal rights of the public or any segment of the public," giving as examples "purely internal personnel practices and directions." *Id.*

The question of whether policies and procedures like DPSCSD 105–4 and 105–5 should be exempt from the normal rules governing the adoption of regulations is not new. At the time the Iowa and Minnesota law review articles were written, both Iowa and Minnesota had expressly addressed the issue by *statutorily* expanding the "internal management" exemption to include policies relating to inmates in State correctional institutions, thus indicating that those policies would not otherwise come within the exemption. A stylistically different but substantially similar approach was taken in the 1981 version of the Model APA drafted by the Uniform Law Commissioners. Section 3–116 of that Model Act not only excludes from the procedural requirements rules concerning only internal management that do not substantially affect procedural or substantive rights of any segment of the public

but separately excludes rules "concerning only inmates of a correctional or detention facility." Bonfield's and Auerbach's articles are cited in the Comment to that section. Some States have adopted that approach. See *Jensen v. Little*, 459 N.W.2d 237 (N.D.1990) and *Beasley v. Commissioner of Correction*, 50 Conn.App. 421, 718 A.2d 487 (1998), noting the North Dakota and Connecticut laws to that effect.

One thing of particular interest is that the separate exclusion suggested in the 1981 Model APA, recently rejected by the Maryland Legislature, covers not just inmates in correctional facilities but also students enrolled in public educational institutions and patients admitted to public hospitals, for the same reason: "The sheer burden of subjecting to usual rule-making and rule-effectiveness requirements the thousands of rules concerning the details of these agencies' daily relationships with inmates, students, and patients would be intolerable." ARTHUR EARL BONFIELD, STATE ADMINISTRATIVE RULE MAKING § 6.17.7, at 415–16. In that regard, we note that the basic requirements regarding the disciplining of students in the public schools were adopted by the State Board of Education in conformance with the APA and appear in COMAR 13A.08.01. The Board obviously did not regard those procedures as mere internal management.

At least four States have considered the issue judicially. New York had a Constitutional requirement that no rule or regulation of any State agency "except . . . as relates to the organization or internal management of [the agency]" was effective until filed with the State Secretary of State. The Commissioner of Correction suspended existing regulations pertaining to inmate disciplinary hearings and adopted, in their place, new regulations intended to be temporary. He did not file them with the Secretary of State, and several inmates who were disciplined in proceedings conducted under the new regulations challenged their validity. The Commissioner sought to justify them as relating to the internal management of the prison. In *Jones v. Smith*, 64 N.Y.2d 1003, 489 N.Y.S.2d 50, 478 N.E.2d 191, 192 (1985), the court rejected that defense, holding:

"Rules and regulations of correctional institutions that affect a prisoner's 'liberty' interests, as here, may not properly be said to involve matters of 'organization or internal management', thus exempting them from the filing requirements.... Such rules and regulations affect the entire prison population, that segment of the 'general public' over which the Department of Correctional Services exercises direct authority, and constitute a 'kind of legislative or quasi-legislative norm or prescription which establishes a pattern or course of conduct for the future.' "

(Citations omitted).

In Michigan, there was an exclusion for intra-agency directives that did not affect the rights of, or procedures and practices available to, the public. An inmate sued to declare the prison disciplinary rules invalid because they had not been adopted in conformance with the State APA, and the question arose whether the rules constituted procedures affecting the rights of the public—whether inmates were part of the public. In *Martin v. Department of Corrections*, 424 Mich. 553, 384 N.W.2d 392 (1986), the court held that inmates *were* part of the public and that the exclusion did not apply. The court rejected the Department's argument that prison discipline rules affect only the inmates and that public comment on those rules would be of little benefit, noting that "[t]his belief seems to overlook the obvious public concern of humanitarian and civil rights groups [and] completely overlooks the concern of the Legislature."

Rhode Island and Tennessee have ruled to the contrary. *See L'Heureux v. State Dept. of Corrections*, 708 A.2d 549 (R.I.1998); *Mandela v. Campbell*, 978 S.W.2d 531 (Tenn.1998). Neither decision is persuasive.

In Rhode Island, the procedural rules governing prison disciplinary proceedings were promulgated to comply with a Federal court decree. The rules were eventually reissued as part of a permanent injunction issued by the Federal court, and both the rules and the injunction remained in effect at the time of *L'Heureux*. A prisoner sued the Department of

Corrections in State court, complaining of violations of those rules. Neither the nature of the alleged violations nor the relief sought is explained. The thrust of the Rhode Island Supreme Court opinion was that the *contested case* provisions of the State APA did not apply to inmate disciplinary proceedings and that decisions made in those proceedings were therefore not subject to judicial review. Several cases were cited for that proposition.[8] Without the benefit of any analysis, the court then simply concluded that, if the contested case part of the APA did not apply, neither did the rule-making requirements: "We are persuaded by the rationale of the foregoing federal and state cases [all of which involved only the contested case provisions of the APA] that the intricate structure of our APA provisions relating both to contested cases and to the exercise of the rule-making power would be ill suited to the management of the often volatile population of the ACI." *L'Heureux, supra,* 708 A.2d at 553. In sweeping with such a broad brush, the Rhode Island court did not seem to take into account the prospect that the revocation of diminution credits might be at risk in disciplinary proceedings—perhaps Rhode Island did not provide for such credits.

The Tennessee decision was influenced in part by *L'Heureux,* which the court quoted, and in part by the court's observation that the Legislature had delegated "considerable deference and broad discretion" to the Tennessee DOC, from

8. That proposition is founded, at least in part, on the holdings in *Wolff v. McDonnell, supra,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 and *Sandin v. Conner, supra,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 that, unless diminution credits are revoked, thereby extending a prisoner's incarceration, or some similar kind of significant deprivation is imposed, a prisoner has no Constitutionally-protected liberty interest in the outcome of prison disciplinary proceedings, those leading merely to temporary segregation or the loss of privileges. The theory seems to be that (1) if there is no Constitutional interest at stake, there is no Constitutional right to a hearing, (2) if there is no Constitutional or statutory right to a hearing, the proceeding is not a contested case under the APA, and (3) if the proceeding is not a contested case, absent a statute, there is no right of judicial review. In *Clardy v. Levi,* 545 F.2d 1241 (9th Cir.1976), the court concluded that Congress did not intend for the contested case requirements of the Federal APA to apply to inmate disciplinary proceedings in the Federal prisons.

which it concluded that "[t]his broad grant of discretion also envisions that those persons intimately involved with the intricacies of the prison system and not the voting public are best equipped to establish policies and procedures for inmate discipline." *Mandela, supra,* 978 S.W.2d at 534. With due respect to the Tennessee court, that is not the issue. Clearly, control over prison management is vested in DOC, subject to the Secretary's overall supervision, and not the "voting public" or, indeed, the Judiciary. *See State v. McCray,* 267 Md. 111, 134, 297 A.2d 265, 277 (1972); *see also Lumumba v. Morton,* 280 N.J.Super. 400, 655 A.2d 487 (1995) (holding that prison rule prohibiting inmates from wearing shirts that could show military rank or group membership was not subject to formal APA rule-making requirements). The question is simply whether inmate discipline procedures adopted by the Secretary that can directly or indirectly affect an inmate's actual length of incarceration qualify as merely internal management guidelines, and, to us, they do not.

The basic regime of identifying prohibited conduct, setting ranges of discipline for the various offenses, and establishing due process-compliant procedures for charging offenses, informing inmates of the offenses charged, and adjudicating culpability has been in place, with occasional modifications, for over 30 years. It is the framework within which much of the discretion accorded to DOC in dealing with inmates operates. It is not the myriad of rules governing the details of prison life—what inmates may wear, what they may or may not keep in their cells or on their persons, the rules governing security, sanitation, hygiene, phone calls, mail, and visits, for example— or the discretionary calls available to correctional officers when confronting inmate misbehavior that must be adopted as regulations, but only the framework. Upon this analysis, we hold that DPSCSD 105–4 and 105–5 constitute regulations under SG § 10–101(g), that they are not exempt from the APA requirements, and that, to be legally effective, they must be adopted in conformance with those requirements.

### *Delayed Effect*

■ Although there may be a fine line here between substance and procedure, the legal deficiency in DPSCSD 105–4 and 105–5 is essentially a procedural one—they were not adopted in conformance with the procedural requirements of the APA. Massey may or may not be entitled to relief on his basic claim, but he *is* entitled to have his claim resolved in accordance with validly adopted procedures. The Legislature has made clear that regulations are not effective unless and until there has been compliance with the statutory requirements, and we have enforced that legislative determination. *See Delmarva Power v. PSC,* 370 Md. 1, 803 A.2d 460 (2002), *on reconsideration,* 371 Md. 356, 809 A.2d 640 (2002). On the other hand, there are some important practical considerations that must be taken into account. As we observed, the directives at issue were put into place in order to comport with Federal due process requirements, so simply declaring them immediately ineffective and leaving nothing in their place is not an option. That would bring prison disciplinary proceedings to a halt.

Under Maryland Rule 8–606, the disposition of an appeal is evidenced not by the Court's opinion but by a mandate issued by the clerk in conformance with the opinion. It is the mandate, which is ordinarily issued 30 days after the filing of the opinion, that constitutes the judgment of the Court. Rule 8–606(b) permits the Court to advance or delay the issuance of the mandate, and, although we rarely exercise that discretion, this case is one in which a delay is appropriate, in order to give the Secretary time to comply with the APA requirements.[9] To that end, we shall direct the clerk to withhold the mandate for 120 days. Massey is entitled to have his claim, unless it has become moot, considered in accordance with valid and effective regulations.

**JUDGMENT OF CIRCUIT COURT FOR ALLEGANY COUNTY REVERSED; CASE REMANDED TO THAT**

---

9. It is not our function to advise the Secretary how to proceed. We do call her attention, however, to SG § 10–111(b).

COURT WITH INSTRUCTIONS TO REVERSE DECISION OF INMATE GRIEVANCE OFFICE AND TO REMAND CASE TO THAT OFFICE FOR FURTHER PROCEEDINGS WITH RESPECT TO MASSEY'S COMPLAINT; MANDATE TO ISSUE 120 DAYS AFTER FILING OF THIS OPINION; COSTS TO BE PAID BY APPELLEE.

BELL, C.J., Dissents and Concurs.

In a thoughtful, thorough, and well reasoned opinion, the majority addresses the validity of certain of the "directives," adopted by the State Department of Public Safety and Correctional Services (DPSCS), the appellee, and pursuant to which Richard L. Massey, Jr., the appellant, having been found to have violated them, was serving additional prison time. The appellant argued that the "directives" at issue in this case are in actuality "regulations," and, therefore, were required to be promulgated in conformance with the State Administrative Procedure Act (the "APA"), Maryland Code (1984, 2005 Replacement Volume) §§ 10–101—10–117 of the State Government Article. After conducting the appropriate analysis, the majority, agreeing with the appellant, concluded that the "directives" are indeed "regulations," as defined in § 10–101(g)(1)[1] of the State Government Article, because they "constitute statements that have general application through-

---

1. Maryland Code (1984, 2005 Replacement Volume) § 10–101(g)(1) of the State Government Article provides:
   " 'Regulation' means a statement or an amendment or repeal of a statement that:
   (i) has general application;
   (ii) has future effect;
   (iii) is adopted by a unit to:
   1. detail or carry out a law that the unit administers;
   2. govern organization of the unit;
   3. govern the procedure of the unit; or
   4. govern practice before the unit; and
   (iv) is in any form, including:
   1. a guideline;
   2. a rule;

out all of the correctional institutions in DOC and apply to all inmates in those institutions; they have future effect; they were adopted by a 'unit' to carry out laws that the unit administers; and they are in the form of rules, standards, statements of interpretation, and statements of policy," 389 Md. 496, 507–08, 886 A.2d 585, 592 (2005). Moreover, continued the majority, the "regulations" were not statements concerning only internal management of the unit, that do not affect directly the rights of the public or the procedures available to the public, thus rejecting the appellee's contention in that regard, that the exception, contained in § 10–101(g)(2) applied. Then, noting the absence of a dispute with respect to the appellant's allegation that these "regulations" were not adopted in conformance with the APA, the majority declared the "regulations" to be invalid and ineffective. *Id.* at 500, 886 A.2d at 587. Specifically, the majority holds "that DPSCSD 105–4 and 105–5 constitute regulations under SG § 10–101(g), that they are not exempt from the APA requirements, and that, to be legally effective, they must be adopted in conformance with those requirements." *Id.* at 524, 886 A.2d at 602. With these holdings and conclusions, I am in complete agreement, and so concur in the opinion to this point.

Having enforced the legislative mandate with respect to the manner of promulgating regulations, the majority, noting the motivation for, and the history of, the adoption of the regulations in this case—to comply with Federal due process requirements—and concerned about "bring[ing] prison discipline proceedings to a halt," delays the issuance of the Court's mandate for 120 days in order that the appellee will have time

---

3.  a standard;
4.  a statement of interpretation; or
5.  a statement of policy."
Subsection (g)(2) excludes from the definition of "regulation," inter alia:
"(i) a statement that:
"1.  concerns only internal management of the unit; and
"2.  does not affect directly the rights of the public or the procedures available to the public."

to comply with the APA. 389 Md. at 525, 886 A.2d at 602. To justify this result, it characterizes the deficiency in the challenged regulations as "essentially a procedural one." *Id.* at 525, 886 A.2d at 602.

As to the appellant's claim, the majority concludes that it remains alive, but that the appellant is not entitled to any specific relief. While it pointedly and expressly refrains from opining on the merits, the majority acknowledges that the appellant has the right to have his claim resolved in accordance with validly adopted procedures. *Id.* Implicit in the majority's decision is either that the appellant did not raise a challenge entitling him to dismissal of the charges against him or any such relief and/or that, in any event, he was not prejudiced by the appellee's failure to act in conformity with the APA. According to the majority,

> "[The appellant's] complaint was that he had been subjected to discipline and had lost diminution credits pursuant to the substantive and procedural provisions of DPSCSD 105–4 and 105–5, which he believed to be invalid, in part, at least, because they had not been adopted in conformance with the APA. His initial challenge, as he made clear, was not to whether he was guilty of an infraction that called for the discipline imposed but only to the Secretary's directives pursuant to which the matter was adjudicated."

*Id.* at 507, 886 A.2d at 591. In effect, it says: unless an appellant, at the least, disputes his or her guilt or states precisely that he or she believes both the charge and the punishment to be deficient, the substantive sufficiency of the one not mentioned has not been challenged and, thus, need not be addressed. It is, therefore, apparently the majority's position that the appellant failed to preserve the issue of his culpability for the infractions with which he was charged and punished. In reaching this conclusion, it gives the appellant's complaint the narrowest possible construction, not to mention an untenable and a strained one.

I have no serious quarrel with the decision to delay the mandate in this case. In fact, in view of the purpose of the regulations, specifically pointed out by the majority, *see* 389

Md. at 525, 886 A.2d at 602—to ensure that prisoners are afforded due process, as required by the Constitution—sensitivity to there being such regulations in place, without a gap, is not simply commendable, it is essential.

Whether the charges and the punishment meted out to, and challenged by, the appellant should be subject to retrial upon the adoption of new, valid regulations is quite another matter. I do not share the majority's view that the appellant failed to raise the issue of his guilt of the infractions with which he was charged, having chosen, altruistically, perhaps, to chide the appellee only as to its procedural default, neglecting entirely to challenge the substantive deficiency. The record does not support that view as a matter of fact.

The appellant's initial complaint was that the "regulations are unlawful," as a consequence of which, in violation of his interest in fairness, he was being punished by being required to serve additional prison time. And, although the grievance he filed following the denial of that complaint addressed only the ground of the denial—that the appellant's complaint exceeded the number of requests for administrative remedy that the appellee permitted by regulation, as to which he argued that such regulation suffered from the same deficiency as those he initially challenged, it was not validly promulgated— the appellant's petition for judicial review reverted to his original ground: he contended that the regulations subjecting him to increased punishment and limiting his access to court were not validly adopted because they were not adopted in accordance with the APA.

I do not believe, as the majority does and seems to require, that where there are various objections to regulations that could be made, separately and seriatim, in a complaint, a prisoner expressly must make each one he intends to pursue to preserve that objection. That is simply not necessary. By challenging the validity of the regulations pursuant to which he had received additional punishment, it is clear beyond cavil that the appellant was doing more than simply raising whether the regulations were properly promulgated as a procedural issue: he was contending that the entire process, from his

being charged, found guilty and punished, was a nullity. If the regulations forming the basis for an infraction are invalid, it seems to me clear that the proceedings pursued pursuant to those regulations can be no more valid. There is, in that circumstance, therefore no necessity that a complainant would, or should, address the particulars of those proceedings; discussing the issue of his guilt or the appropriateness of the punishment imposed, under these circumstances, is simply irrelevant and unnecessary.

I agree with the majority that the appellant "is entitled to have his claim resolved in accordance with validly adopted procedures." 389 Md. at 525, 886 A.2d at 602. On the other hand, this Court's holding that the regulations pursuant to which the appellant was charged, convicted and punished were not validly promulgated answered fully and adequately the appellant's concern. Because the regulations were invalidly promulgated and thus are a nullity, the effect of that holding necessarily is that the actions taken pursuant thereto are nullities, as well. The appellant's additional punishment therefore is of no effect and this Court should clearly and unhesitatingly say so.