# PUBLIC PROPERTY

## COMMISSION ON ARTISTIC PROPERTY – MANAGEMENT AND TRANSFER OF PUBLIC PROPERTY – INTERNAL MANAGEMENT EXCEPTION TO RULEMAKING REQUIREMENT

February 8, 2016

*The Honorable Timothy D. Baker*
*State Archivist*
*Maryland State Archives*

On behalf of the Commission on Artistic Property (the "Commission"), you asked for our opinion on certain issues relating to the Commission's custody and control over the artistic property held by the State. The Commission is the body within the Maryland State Archives (the "Archives") that is charged with the care and official custody of most of the "valuable paintings and other objects of decorative art owned by or loaned to the State." Md. Code Ann., State Gov't ("SG") § 9-1021(a). In addition, when the State purchased the Peabody Art Collection from the Peabody Institute in 1996 for $15 million, the Commission also became the "official custodian" of that collection. SG § 9-1021(a)(2). "With respect to the objects subject to its official custody," the Commission must "keep a continuing inventory of the objects" and "be responsible for and supervise the acquisition, custody, display, location, preservation, proper care, security, and restoration of the objects." SG § 9-1021(a)(1)(i), (ii).

Pursuant to its statutory mission, the Commission has maintained a comprehensive inventory list of all of the artistic property in its official custody. As we understand it, however, some objects that presently are recorded on the list may not belong there. For instance, some objects are damaged beyond restoration, and some might not qualify as "valuable paintings" or "other objects of decorative art." Additionally, approximately 25 objects listed as part of the Peabody Collection may not even be owned by the State, because they were not included in the 1996 purchase contract between the State and the Peabody Institute. The Commission has thus begun drafting a collections management policy to establish criteria for removing an object from the list or— as a museum curator might describe it—"deaccessioning" a piece from the collection.[1]

---

[1] We note for purposes of clarity that, although deaccessioning an object from a private museum's collection might mean both removing the object from the museum's inventory list and selling the object, it

You have raised a series of questions concerning the Commission's authority to formulate a deaccession policy and the extent to which, in doing so, the Commission is bound by the rules governing the disposition of State property set forth in the State Finance & Procurement Article. These questions, paraphrased somewhat, are as follows:

> (1) Does the Commission have authority to remove objects from the official list of artistic property? In particular, may the Commission remove from the inventory list objects that the Commission believes the State never acquired?

> (2) Does the Commission have authority to sell, transfer, or dispose of objects subject to its official custody? If so, must the Commission follow the rules in the State Finance & Procurement Article governing the disposition of State property, including the requirement to obtain approval from the Board of Public Works?

> (3) Does the Commission have authority to formulate an official collections management policy, including a deaccession policy, and, if so, must the Commission promulgate the policy through regulations?

In our view, if the Commission is simply removing objects from the official list of artistic property without transferring ownership or otherwise disposing of the property, the Commission has inherent authority to do so because the General Assembly has delegated to it the power to decide what qualifies for inclusion on the list. Similarly, if there are objects on the inventory list that the State does not actually own, the Commission need not obtain approval to remove those objects from the list. If the Commission

---

makes sense to distinguish the two concepts for public entities. Removing a piece of artistic property from a particular public collection does not necessarily show that the State intends to relinquish ownership of the property entirely. *See*, *e.g.*, Fla. Admin. Code Ann. r. 1T-12.001(4), (5) (separately defining "deaccession" and "disposal"). To avoid confusion, we will use more specific terminology, such as "removing the object from the inventory list" or "transferring or disposing of" the object, to describe the types of actions that might be encompassed by the Commission's deaccession policy.

seeks to sell, transfer, or otherwise dispose of artistic property, however, it must follow the procedures outlined in the State Finance & Procurement Article. The Commission thus needs the approval of the Board of Public Works to alienate artistic property to a private entity or transfer property to another State agency unless the property is "excess" property, in which case the Commission must obtain the approval of the Department of General Services. *See* Md. Code Ann., State Fin. & Proc. ("SFP") §§ 4-501 to 4-508, 10-304, 10-305(a).

Finally, we conclude that the Commission may formulate a collections management policy that establishes criteria for removing objects from the inventory list. The more difficult question is whether this policy will have to be promulgated by regulation. Our answer depends to some degree on the final content of the policy, and the safest course would be to adopt the collections management policy by regulation. Nonetheless, assuming the final policy is properly crafted, we believe that the Commission may adopt a collections management policy without following the procedures for promulgating formal regulations because such a policy "concerns only internal management of the unit" and "does not affect directly the rights of the public or the procedures available to the public." SG § 10-101(g)(2).

# I

## Background

### A. *The Commission on Artistic Property*

The General Assembly created the Commission on Artistic Property in 1969 to "keep a continuing inventory of valuable paintings and other decorative arts in all State buildings and premises in the Annapolis area" and to "provide for the location, proper care, custody, restoration, display, and preservation" of these objects. 1969 Md. Laws, ch. 111, codified at Md. Ann. Code art. 78A § 52 (1969). The Legislature has made frequent changes to the composition and character of the Commission over the years. As originally constituted, the Commission was a unit within the Board of Public Works, with all three of its members appointed by the Board. Art. 78A, § 52(a). In 1977, the Commission was made part of the Department of General Services ("DGS"), *see* 1977 Md. Laws, ch. 225, and in 1984 it was moved to the newly-created State Archives, where it remains today. 1984 Md. Laws, ch. 286, §§ 5, 8, codified at SG § 9-1017 (1984). In its current form, the Commission consists of fifteen members, seven of whom are "institutional members" from specific cultural institutions in

Maryland—such as the Baltimore Museum of Art, the Peabody Institute, the Walters Art Museum, and the Maryland Historical Society—and eight of whom are "public members" appointed by the State Archivist with the approval of the Governor.  SG § 9-1018.

The Commission retains its original statutory responsibility for keeping "a continuing inventory of the objects" in its official custody and for "the acquisition, custody, display, location, preservation, proper care, security, and restoration of the objects," SG § 9-1021(a), but the extent of the collection in the Commission's custody has expanded.  The Commission is now the "official custodian" not just of the decorative art in the Annapolis area but also "of *all* valuable paintings and other objects of decorative art owned by or loaned to the State," except for those located in a State room of the Government House or acquired through the Maryland Public Art Initiative Program.  SG § 9-1021(a)(1), (c) (emphasis added).

In exercising its "custodial responsibilities," the Commission "may loan objects owned by the State to qualified institutions and may contract with such institutions for the performance of curatorial services."  SG § 9-1021(a)(3).  Additionally, "[e]ach person or agency that desires to acquire a painting or object of decorative art for display in or on the premises of any State building, except in a room of the Government House, must receive both prior approval and final acceptance from the Commission." SG § 9-1021(b).  With the approval of the Governor and the State Archivist, the Commission also may accept, on behalf of the State, gifts and loans of artwork, and the Commission is charged with caring for the art it accepts under this authority.  SG § 9-1020(a).

The Commission views its mission as to "serve the public as the official custodian of the state owned art collection, as well as fine and decorative arts owned by or loaned to the State." Maryland State Art Collection, Mission Statement.  Although the State's art collection primarily includes "those works of art and decorative objects that document the history of Maryland through subject, maker, or provenance," *id.*, it is not limited to these objects and includes other valuable artistic property owned by the State. Some of the pieces in the Commission's custody are housed at the State Archives, while others are displayed in State buildings or on loan to cultural institutions like the Walters or the Baltimore Museum of Art for display in their museums.  "The goal of the Commission is to make the collection accessible to the public through preservation, conservation, display and interpretation."  *Id.*

### B.    *The Peabody Art Collection*

George Peabody founded the Peabody Institute and the Peabody Gallery of Art in 1857.  *See* Maryland State Archives, "The Peabody Art Collection: A Treasure for Maryland," http://msa.maryland.gov/msa/speccol/sc4600/sc4680/html/history. html (last visited May 18, 2015).  In the mid-1930s, the Peabody Institute closed the Gallery to make more space for the Peabody Conservatory of Music.  Johns Hopkins University later took the Peabody Institute "under its wing," but the Institute became a "financial burden" to the University, and Johns Hopkins started looking for ways to raise capital to support the Institute's operations.  *Id.*  A task force led by the Lieutenant Governor devised the "Peabody Plan," under which the State acquired the Peabody Art Collection in exchange for a $15 million contribution to the endowment fund of the Peabody Institute.  *Id.*  To accommodate the plan, the General Assembly amended the Commission's governing statute to provide, among other things, that the Commission would become the "official custodian" of the Peabody Art Collection upon completion of the sale of the collection to the State.  SG § 9-1021(a)(2); *see also* 1995 Md. Laws, ch. 331.

In preparation for the sale, the Peabody Institute provided the staff of the Commission on Artistic Property with a list identifying every object in the Peabody Art Collection.  *See* Memorandum from the Staff of the Commission on Artistic Property to the Collections Advisory Committee (March 12, 2014).  The Commission staff then entered this preliminary list of objects into a database so that they could be added to the Commission's inventory once the transfer was complete.  *Id.*  It is our understanding that before the Board of Public Works approved the sale, staff of the Peabody Institute and the Commission discussed whether certain items on the preliminary list should be included in the sale.  Among the items discussed, for example, were friezes and reliefs that are part of the fabric of the Institute's building.  The friezes and reliefs and certain other objects were ultimately not included in the final sale.

The contract between the Institute and the State, which was approved by the Board of Public Works in June 1996, included an "inventory of the collection," which was made a part of the contract.  *See* Contract of Sale, Peabody Art Collection (June 19, 1996); *see also id.* Exhibit A ("Inventory and Illustrations"). This inventory list presumably reflected the final outcome of the discussions between the Commission and Institute about which

objects should be included in the sale. The Commission, however, did not delete from its database some of the objects that had appeared on the preliminary list but were not included in the final inventory annexed to the contract. Those objects then found their way onto the Commission's official list of artistic property.[2]

## C. General Rules for the Transfer, Sale, and Disposition of State Property

The General Assembly has delegated to the Board of Public Works broad authority to oversee the disposition of State property. *See* SFP § 10-305(a) (providing that "any real or personal property of the State or a unit of the State government may be sold, leased, transferred, exchanged, granted, or otherwise disposed of" with the approval of the Board of Public Works "for a consideration the Board decides is adequate").[3] Under the statute, the Board may not approve the sale or transfer of personal property worth over $100,000 until the property has been appraised and the Board has given the Legislative Policy Committee of the General Assembly an opportunity to review the proposed disposition. SFP § 10-305(b). Legislative review and appraisal is not required for personal property worth $100,000 or less. *Id.*

The Board's power over State property extends not only to transfers to private entities or other governments, but also to transfers among units of State government. Section 10-305 specifically authorizes the Board to approve the transfer of property from one "unit of the State government" to another "for a consideration the Board decides is adequate." SFP § 10-305(a)(1). The Board also has separate authority to "transfer any property, and all rights of physical custody and control over the property," among Executive Branch units without requiring any consideration. SFP § 10-304(b)(1). Property transferred among Executive Branch

---

[2]    There is a dispute between the Archives and Johns Hopkins about the ownership of two manuscripts that *were* listed in the contract of sale and transferred to the State. Johns Hopkins believes that the manuscripts were mistakenly included in the contract and that the transfer to the State is void. An Attorney General's opinion cannot sort out factual disagreements of this kind. Our general practice is to offer our views on the law based on the facts presented to us in the opinion request, and we shall do so here.

[3]    The State may also sell, transfer, exchange, grant, or dispose of State property "to any county or municipal corporation in the State subject to any conditions the Board imposes." SG § 10-305(a)(2).

units under § 10-304 is exempt from the appraisal requirements of § 10-305(b)(2)(i).  SFP § 10-304(b)(2).

Although the Board has been delegated primary responsibility for decisions concerning the disposition of State property, some transfers of State-owned property do not need Board approval.  The General Assembly has authorized the Department of General Services to approve transactions involving State-owned "excess" personal property.  *See generally* SFP §§ 4-501–4-508.  Under this statutory scheme, an agency may declare an item to be excess personal property if it is "not necessary to the efficient operation of the unit" or if it has been "replaced by a similar item."  SFP §§ 4-501(b), 4-502(a)(1).  The agency's declaration becomes effective upon approval by DGS.  SFP § 4-502(a)(2).  Once property is designated as "excess," DGS either transfers it to another unit of State government, SFP § 4-504(b)(1), or, if the property is not needed by any unit of State government, DGS may declare it to be "surplus personal property" and dispose of the property by selling it to a person or entity outside of State government.  SFP §§ 4-501(d), 4-504(c), (d).  The Secretary of DGS may also "destroy[]" the property "if no value can be realized from it."  SFP § 4-504(d)(1)(v).

The Secretary of DGS may delegate to a designee or, by regulation, to another unit of the State government, the authority to dispose of surplus personal property.  SFP § 4-504(e).  In limited circumstances, DGS has stated that it is an "agency responsibility" to destroy or discard certain "non-capital equipment" owned by the agency—such as "miscellaneous equipment, furniture, desk top articles and the like"—if that equipment is "worn or damaged beyond economical repair" and its acquisition cost was less than $100.  DGS Inventory Control Manual ("DGS Manual") §§ I.04, III.02.C (revised July 2012).

# II

## Analysis

The extent to which the Commission may transfer or dispose of artistic property in its official custody is primarily a question of interpreting the statutory provisions that have delegated the power to dispose of State property to the Commission, the Board of Public Works, and DGS.  As with all questions of statutory interpretation, we look first to the plain language of the statute, but we must also take into account the broader statutory context, including other related statutes.  *TransCare Maryland, Inc. v. Murray*, 431 Md. 225, 232 (2013).

As an initial matter, it is important to distinguish between the Commission's authority to dispose of property and its authority to remove an object from an inventory list to more accurately reflect the State's actual holdings. In our view, a decision to remove an object from the official list of artistic property maintained by the Commission will not by itself result in any alteration of the State's property rights in that object. We will thus address these questions separately, starting with the Commission's power over its inventory list and then its power to actually dispose of State property.

### A. *The Commission's Power over Its Inventory List*

The first question is whether the Commission may remove an object from its official list of artistic property on its own initiative so long as the object remains State property. The Commission is the "official custodian of all valuable paintings and other objects of decorative art owned by or loaned to the State." SG § 9-1021(a)(1). It has a duty to "keep a continuing inventory" of the objects in its collection, *id.*, and decides whether to accept new objects into the collection. *See* SG § 9-1021(b) (requiring agencies to obtain approval from the Commission before acquiring art to display in government buildings). The Commission thus has broad authority to add or remove objects from the official list of artistic property to carry out this express statutory duty to "keep a continuing inventory." SG § 9-1021(a)(1).

Before granting agencies approval to acquire new artwork, the Commission must consider the "competence of the artist," the "proposed location of the object," and the "quality, historical significance, and appropriateness of the work," SG § 9-1021(b)(2), but the Legislature has not fleshed out these broad standards or provided any criteria for determining when objects that are already owned by the State are worthy of being accepted into the collection. Accordingly, we believe that the General Assembly intended to delegate those decisions to the Commission. *See* 75 *Opinions of the Attorney General* 241, 245 (1990) (explaining that the General Assembly, by declining to explicitly define certain eligibility criteria, "effectively delegated to the administrative agency . . . the responsibility for establishing eligibility criteria"); *cf. Board of Liquor License Comm'rs for Baltimore City v. Hollywood Prods., Inc.*, 344 Md. 2, 11 (1996) ("Where the legislature has properly and broadly delegated regulatory authority to an agency, we have quite liberally construed the scope of the agency's implied powers to act in that area."). After all, the Commission includes experts in the field and is thus better equipped than other units of State government to determine whether art owned by or lent to the State

is sufficiently valuable or decorative to qualify for inclusion in the official inventory of artistic property.  *See* SG § 9-1018.

The logical corollary to this conclusion is that the Commission should also have broad discretion in deciding whether to *remove* objects from the inventory list.  If the Commission could have declined to add the object to the inventory list in the first place because it is not "valuable" or it is not a "decorative art," it should be able to remove the object from the list if, for example, the object was mistakenly included or has deteriorated beyond restoration and no longer has any monetary, artistic, or historical value.[4]  Although we conclude that the Commission has inherent authority to remove objects from the official list of State artistic property, there may be legal requirements that are triggered by the Commission's exercise of that authority.  For example, the Commission's removal of objects from the list of artistic property might require adding the object to a standard State property inventory, like the one most State agencies are required to keep.  *See* SFP § 4-306(b).

The final question concerning the Commission's authority over its inventory is whether the Commission may delete from its official inventory list objects that it believes the State does not actually own, such as pieces from the Peabody Collection that were not included in the sales contract between the State and the Peabody Institute.  It is not our role to address specific factual scenarios or adjudicate specific factual disputes, but, generally speaking, we think that the Commission may do so.  As discussed above, the Commission has statutory responsibility to maintain a "continuing inventory" of the valuable artistic property "owned by or on loan to the State" and the objects "acquire[d]" as part of the Peabody Art Collection.  SG § 9-1021(a)(1), (2).  If an object was never acquired by the State, it is not owned by the State—as part of the Peabody Art Collection or any other collection—and the Commission may remove the object from its inventory list.

We reiterate, however, that the Commission's decision to remove an object from the inventory list does not and cannot

---

[4]  The only apparent exception is for the items that the State acquired from the Peabody Art Collection.  The statute expressly mandates that the Commission is "the official custodian of the Collection," regardless of whether those items are valuable paintings or decorative art.  *See* SG § 9-1021(a)(2).  Because the objects are in the Commission's official custody, it has a mandatory obligation to keep them on the "continuing inventory" as long as they are still owned by the State.  SG § 9-1021(a)(1)(i).

relinquish State ownership. As discussed further below, that power is vested in the Board of Public Works and DGS. Thus, if the Commission mistakenly removes from its official list of artistic property an object that the State actually *does* own, the removal from the list will not by itself transfer ownership over the object. The only way to transfer ownership, particularly if the object is in the State's possession, would be to follow the standard procedures outlined in the State Finance & Procurement Article and seek approval from the Board of Public Works. *See* SFP § 10-305(a) (explaining that the Board's power extends to all "real and personal property" of the State); SFP § 10-301(3) (defining "real or personal property" to include "any legal or equitable rights, interests, privileges, or easements in, to, or over any real or personal property").

## B. The Commission's Power to Dispose of Property

The provisions of the State Government Article that govern the Commission's powers do not authorize the Commission to transfer or dispose of property on its own. Although the Commission may "*loan* objects owned by the State to qualified institutions," SG § 9-1021(a)(3) (emphasis added), it does not have authority to perform any other actions that dispose of State-owned property. That broader authority is instead found in the State Finance & Procurement Article, which expressly grants this authority to the Board of Public Works or, in certain cases, the Department of General Services. SFP §§ 4-504, 10-305.

Nothing in SFP § 10-305 or in the State Government Article exempts the Commission from these requirements. Rather, it appears that the Legislature always intended that the Commission would be subject to the Board's authority and the generally-applicable limits on a State agency's authority to transfer or dispose of State property. When the Commission was created, it was part of the Board of Public Works, and its governing statute was codified in the same title as the predecessor to § 10-305, which contained the same requirement for the Board to approve transfers of State property. *See* Md. Ann. Code art. 78A, §§ 15, 52 (1969 Repl. Vol.). Later, the Commission was relocated to the Archives, which is itself subject to Title 10 of the State Finance & Procurement Article. SG § 9-1008(b)(3); *see also* SG § 9-1017. The Commission's position within State government suggests that it is subject to these generally-applicable rules governing the disposition of State property.

We also see no basis on which to conclude that the Commission has *implied* power to dispose of State property outside

the process established by the General Assembly. The structure of the statute does not suggest that the Legislature intended to convey that power by implication. Had such an implied power been intended, it presumably would not have been necessary for the General Assembly to expressly authorize the far more limited power to loan artwork to qualified institutions. *See* SG § 9-1021(a)(3). Although the Commission has substantial control over the artistic property within its official custody, we find no indication that the Legislature intended to give the Commission free rein to sell, or perhaps even give away, valuable works of art without providing express authority to make those decisions.[5] *Cf. McRobie v. Mayor and Comm'rs of Westernport*, 260 Md. 464, 467 (1971) (observing that municipal "property held in a governmental capacity cannot be disposed of without express authority"). It is our view, then, that the Commission must follow the standard procedures outlined in the State Finance & Procurement Article before it may transfer or dispose of State property.[6] This means

---

[5] Johns Hopkins University submitted comments on the opinion request positing that the Commission must have implied power to transfer artwork because, "[w]ithout such an implied power, the Commission would be unable to fulfill the complete scope of its duty to protect the artwork within its custody." Letter from Winston Tabb, Dean of University Libraries and Museums, to Adam D. Snyder, Chief Counsel, Opinions & Advice at 5 (Aug. 5, 2015). According to the University, the Commission would need "the flexibility to transfer fragile or unique artwork that the State may at some point become unable to properly care for" and to "transfer works as necessary to ensure that its collection aligns with its statutory mission." *Id.* Although we agree that this type of flexibility is important, it is already provided by other statutory provisions. For example, the Commission can address the first concern by loaning objects in its official custody to another museum and contracting with that museum for curatorial services. *See* SG § 9-1021(a)(3). Similarly, the fact that an object might not align with the Commission's statutory mission does not necessarily mean that the State as a whole should relinquish ownership over the object, at least without going through the statutory process for doing so.

[6] There may also be additional limits on the State's authority to transfer specific pieces of Commission property. For example, principles of contract or trust law might prohibit the sale or transfer of artistic property that was gifted to the State. *See*, *e.g.*, *Grossman v. Greenstein*, 161 Md. 71, 73 (1931) ("A donor may limit a gift to a particular purpose, and render it so conditioned and dependent upon an expected state of facts that, failing that state of facts, the gift should fail with it.").

that the Commission will typically need to obtain Board of Public Works approval before transferring artistic property.

### C.   *Excess and Surplus Property*

The General Assembly has delegated the authority to dispose of certain types of property to the Department of General Services rather than the Board of Public Works. Sections 10-304 and 10-305 of the State Finance & Procurement Article "do[] not apply to the transfer or disposal of excess personal property or surplus personal property under Title 4, Subtitle 5" of that Article. SFP § 10-302. Instead, DGS has the authority to dispose of "excess" and "surplus" personal property. *See* SFP § 4-504. Accordingly, if the Commission wants to dispose of "excess" personal property, it must use the procedures outlined in Title 4, Subtitle 5 of the State Finance & Procurement Article. *See* Section I.C, *supra*. The preliminary question is whether any of the Commission's artistic property might ever qualify as excess property.

The statute defines "excess property" as "an item of personal property that is declared to be in excess of the needs of the custodial unit of the State government because the item: (1) is not necessary to the efficient operation of the unit; or (2) has been replaced by a similar item." SFP § 4-501(b). It is not clear that the General Assembly had artistic property in mind when formulating this definition; administrative efficiency is typically not the yardstick by which one measures the value of art. But, given that the Commission's entire (and unique) purpose is to manage, care for, and display the State's artistic property, we think that the valuable paintings and decorative arts in the Commission's custody are likely "necessary" to the operation of the Commission and, at least in most cases, would not constitute excess property. Generally speaking, therefore, the Commission will still have to get approval from the Board of Public Works before transferring such items to another unit of State government, trading them for artistic property from another institution, or otherwise disposing of them.

However, if the artistic property in question is not actually a valuable painting or object of decorative art that is properly part of the Commission's official inventory of artistic property, we think it could be declared excess. The property in that case is not "necessary" to the Commission's operations or its statutory mission. Similarly, artwork could potentially be declared excess property if it has deteriorated beyond restoration and has no continuing artistic, monetary, or historic value. If DGS approves that declaration, *see* SFP § 4-502, DGS could then dispose of the property. Alternatively, if DGS determines that no unit of State

government needs the property and declares it to be surplus, DGS could delegate the final disposition of that surplus property to the Commission. *See* SFP § 4-504(e) (providing that the Secretary of DGS "may delegate the authority to dispose of surplus personal property to a designee of the Secretary or, by regulation, to another unit of the State government").[7]

The legislative history of the excess property program supports handling excess and surplus property differently from the types of property that require Board of Public Works approval. For decades, the Board of Public Works had been forced to decide "thousands of minor transactions" on routine items, including the disposal of State-owned personal property. Alan M. Wilner, *The Maryland Board of Public Works: A History* 96 (1984) (quoting Commission on Administrative Organization of the State, Eighth Report, at 2:20) (Nov. 1, 1952)). One example of "this tedious action" occurred at a 1946 meeting "when the board had to approve the sale of seventy-five worn-out tires by the State Roads Commission for $7." *Id.* at 96 n.75. A 1952 commission report recommended that the Board should "'retain its authority over major decisions'" involving State property but that "board approval should not be required for the disposition of personal property worth less than $10,000." *Id.* (quoting Eighth Report, at 20-21).

Although legislation was not enacted at the time, the General Assembly again considered the issue after a 1980 study, which proposed giving DGS control over the disposition of excess personal property. *See* Reports of Committees to the General Assembly of Maryland 1980 Session, *Summary Report of the Purchasing and Procurement Policies Task Force*, Exhibit A at 394-97. The General Assembly enacted the predecessor of the current excess property statute two years later. 1982 Md. Laws, ch. 328. An official from DGS testified that the purpose of a nearly identical bill from 1981 was to "[k]eep the minutia away from the Board of Public Works." 1981 Leg., Reg. Sess., Hearing on House Bill 1090 (notes on testimony by the Department of General Services). In the context of artistic property, we believe this legislative history suggests that the Board retains approval authority over the disposition of valuable artistic property that is

---

[7] If the Commission wishes to transfer excess property to a particular recipient, it should go through the Board of Public Works because an agency loses control over the ultimate destination of its property once DGS has approved an agency's declaration of it as excess. *See* SFP § 4-504.

properly part of the Commission's official collection, but that DGS has control over the disposition of excess artistic property that is not valuable and does not belong on the official inventory.[8]

### D. The Commission's Authority to Formulate a Collections Management Policy

Your final questions are whether the Commission may formulate a collections management policy, including a deaccession policy, and whether that policy must be promulgated through regulations. It is our understanding that this collections management policy would include requirements for the storage, care, and preservation of artistic property in the Commission's collection; procedures for maintaining the Commission's inventory; and standards for determining when objects should be accessioned or deaccessioned (*i.e.*, added or removed) from the inventory list.

As an initial matter, we see nothing that would prevent the Commission from formulating a collections management policy so long as the Commission follows the requirements in the State Government Article governing the Commission's operations and in the State Finance & Procurement Article governing the disposition of State-owned property. An agency may take steps to ensure that its operations are carried out consistently and in accordance with its organic law. The more difficult question is whether such a policy would have to be promulgated as a regulation under the Administrative Procedure Act ("APA").

The APA "applies to virtually every unit in the Executive Branch" and "prescribes a number of procedural requirements for the adoption of a regulation." 75 *Opinions of the Attorney General* 37, 43 (1990). The question, then, is whether a given agency action

---

[8] There are limited circumstances under which an agency may dispose of excess State property without having to go through DGS. The Inventory Control Manual published by DGS provides that agencies have "responsibility" for disposing of their own "non-capital equipment" that originally cost less than $100 and is "worn or damaged beyond economical repair." DGS Manual Section III.02.C.2. It is not clear to us whether any Commission property would fall into this category. Art is not "equipment" in the traditional sense, and the exception appears intended to cover items like pens and office furniture. Although it is possible that this exception would apply to paintings or decorative arts that are so deteriorated as to be beyond restoration and have no historic, artistic, or economic value, the safer course legally would be to dispose of them through DGS's standard excess property program unless DGS formally delegates to the Commission the authority to dispose of the property.

qualifies as a "regulation" under the APA. "[I]f an agency's action constitutes a regulation, as that term is defined by the APA, the action may be taken only in accordance with [the APA's] rulemaking procedures." 75 *Opinions of the Attorney General* at 44 (quotation marks and citation omitted). The APA defines "regulation" to include "a statement" that "has general application" and "future effect" and is adopted by a unit of government to "detail or carry out a law that the unit administers," or to govern the organization, procedure, and practice before the unit. SG § 10-101(g)(1). The substance of the statement, rather than the form, determines whether it is a regulation. The APA applies even to guidelines, standards, statements of interpretation, or statements of policy as long as they otherwise meet the definition of a regulation. SG § 10-101(g)(1)(iv).

Based solely on this definition, the Commission's collections management policy would likely constitute a regulation. It has general application and future effect, and would be adopted to carry out the Commission's organic statute and to govern agency procedure. But "[n]ot every administrative action with public consequences is a rule." 68 *Opinions of the Attorney General* 9, 12 (1983) (quoting *United Parcel Serv. v. Oregon Transp. Comm'n*, 555 P.2d 778, 780 (Or. Ct. App. 1976)). The statutory definition of regulation instead contains a number of express exceptions. One of those exceptions excludes from the definition of "regulation" statements that "concern[] only internal management of the unit" and "do[] not affect directly the rights of the public or the procedures available to the public." SG § 10-101(g)(2).

This "internal management" exception has been part of the APA since its enactment, but "there has been surprisingly little comment on [its] general meaning and scope." *Massey v. Department of Pub. Safety & Corr. Servs.*, 389 Md. 496, 519 (2005). Its purpose is to prevent the APA's procedural requirements from intruding "too far into the internal workings of the agency" while at the same time preventing agencies from "subvert[ing] public rulemaking requirements" by calling everything "an internal directive to staff." *Id.* at 519 (internal quotation marks omitted). We have previously explained that "virtually every internal management directive will have at least some tangential effect on the public," so the "key" is whether a policy "primarily addressed to State personnel nevertheless has significant direct effects on the public, as distinct from inevitable, indirect ones." 72 *Opinions of the Attorney General* 230, 235 (1987). In other words, whether a policy "is exempt from rulemaking by virtue of the 'internal management' exception depends on the practical consequences for members of the public."

*Id.* "The exception applies only if the internal guidance does not significantly affect either the procedural steps that interested persons must take in their dealings with an agency or the allocation of substantive benefits or burdens." *Id.* at 235-36.

Based on this test, we have concluded that a policy governing smoking on State property qualified for the internal management exception because it applied primarily to State personnel and involved the "custodial management of public property," even though it incidentally affected members of the public who visited the property. *Id.* at 236-37 (quoting *Holdman v. Olim*, 581 P.2d 1164, 1170 (Haw. 1978)). By contrast, policies that set eligibility criteria for government programs are not internal and need to be promulgated through the regulatory process because they have a direct and substantive effect on the allocation of government benefits. *See*, *e.g.*, 78 *Opinions of the Attorney General* 8, 18 (1993) (eligibility for a program to help individuals with developmental disabilities).

The Court of Appeals, for its part, has endorsed a description of the internal management exception as "pragmatic," "balanced," and "narrowly drawn." *Massey*, 389 Md. at 519-20 (citing Arthur Earl Bonfield, *State Administrative Rule Making* § 6.17.2; *see also Evans v. State*, 396 Md. 256, 347 (2006) (same). "The kinds of statements falling within the ambit of the exception," according to the Court, are those that "'face inwards' and do not 'substantially affect any legal rights of the public or any segment of the public.'" *Massey*, 389 Md. at 520 (quoting Arthur Earl Bonfield, *The Iowa Administrative Procedure Act*, 60 Iowa L. Rev. 731, 834 (1975)). Conversely, "no exclusion will be allowed if the agency statement substantially affects rights of the public of a sort that are cognizable as a matter of law; that is, rights which are normally enforceable against the agency or other parties through legal processes." *Id.* at 520 (quoting Bonfield, *The Iowa Administrative Procedure Act* at 834). The "real test" is "whether, given the nature and the impact of the [statement], the Legislature intended that the agency be free to adopt, change, or abrogate the [statement] at will, without any public input or legislative review." *Evans*, 396 Md. at 347-48 (holding that the State's protocols for carrying out executions by lethal injection had to be promulgated by regulation).

In our view, the Court of Appeals decisions and our prior opinions stand for the same basic principle: A policy statement will qualify for the exception when it "faces inward," *i.e.*, is addressed primarily to agency personnel, and has no direct,

substantial effect on the public's substantive or procedural rights.[9] *See Evans*, 396 Md. at 347; *Massey*, 389 Md. at 519-20; 72 *Opinions of the Attorney General* at 235-36. Therefore, internal guidance will be exempt from the APA's rulemaking requirements even if it has an incidental effect on the public or if it affects the public in some way that does not substantially impair their legal rights or the procedures available to them. *See* 72 *Opinions of the Attorney General* at 235-36.

Applying these principles here, some aspects of the Commission's collections management policy will unquestionably qualify for the internal management exception. The inventory procedures and the requirements for the storage, care, and preservation of artistic property in the collection are quintessential internal management guidelines that are directed solely to agency personnel and merely involve the "custodial management of public property" entrusted to the agency. *Id.* (quoting *Holdman*, 581 P.2d at 1170)). The maintenance of an inventory also helps the agency ensure that it can effectively carry out its obligation to care for the art in its custody. Although the public might have a general interest in the proper care of the State's artistic property, it has no "rights . . . of a sort that are cognizable as a matter of law." *Massey*, 389 Md. at 520 (quoting Bonfield, *The Iowa Administrative Procedure Act* at 834).

The Commission's accession and deaccession policies pose a closer question. These policies are largely internal in that they involve the Commission's administrative housekeeping over its own inventory. However, they arguably have an effect on

---

[9] The Court's citation in *Massey* of another passage from Professor Bonfield's work could be taken to suggest that the exception applies even more narrowly and extends only to "matters of internal agency management *that are purely of concern to the agency and its staff*." *Massey*, 389 Md. at 520 (quoting Bonfield, *State Administrative Rule Making* § 6.17.2 (emphasis provided by Court)). However, the public always has an interest in how the agencies of State government operate, so very little of what an agency does, even in managing its own internal procedures, is purely of concern to the agency and its staff. "[V]irtually every internal management directive will have at least some tangential effect on the public." 72 *Opinions of the Attorney General* at 235. We think the scope of the exception is better captured by the Court's endorsement of Professor Bonfield's statement suggesting that an agency's internal statement must not "*substantially* affect any legal rights of the public or any segment of the public" in order to qualify for the exception. *Massey*, 389 Md. at 520 (emphasis added).

members of the public who want to see particular pieces of art on display, who want to purchase art from the Commission, or who want to sell art to the State. The Commission holds the art in trust for the *public*, and the public will thus have an interest in the Commission's decisions about which pieces belong in the State's official collection. Along these lines, the policies may affect the public's perception of the process by which the State divests itself of artwork held in the public trust or acquires artwork with public funds. *See Evans*, 396 Md. at 349 (noting that lethal injection regulations affected inmates who had been sentenced to death and the public at large through its "perception of the process"). In fact, a number of government-owned cultural institutions in other states have promulgated accession and deaccession policies via regulation,[10] though, in some cases, their governing statutes explicitly required them to do so.[11]

Although not free from doubt, we conclude that the Commission may adopt a deaccession policy outside of the formal rulemaking process. As we have interpreted the statutory scheme, the deaccession policy would merely be an internal tool for managing the Commission's inventory and making recommendations to other decision-makers about which artistic property is excess or should, for other reasons, be sold or transferred. Because the policy will not actually govern the disposition of State property—that power being reserved to the Board of Public Works or DGS—we do not think it would "substantially affect[] rights of the public of a sort that are cognizable as a matter of law," *Massey*, 389 Md. at 520 (quoting Bonfield, *The Iowa Administrative Procedure Act* at 834), or "significantly affect either the procedural steps that interested persons must take in their dealings with an agency or the allocation of substantive benefits or burdens," 72 *Opinions of the Attorney*

---

[10] *See*, *e.g.*, Alaska Admin. Code tit. 4 §§ 58.110, 58.140 (Alaska State Museum); Fla. Admin. Code Ann. r. 1T-12.003, 1T-12.006 (Florida Museum of History); Iowa Admin. Code 223-13.5(303), 223-13.6(303) (Iowa Historical Society); Kansas Admin. Regs. § 118-1-4 (Kansas Historical Society); La. Admin Code. tit. 25, pt. III, §§ 301, 303 (Louisiana Office of State Museums); Miss. Admin. Code 16-5:1.1–16-5:1.2 (Mississippi Dep't of Archives and History, Museum Division); N.M. Admin. Code 4.51.29.8 (Museum of New Mexico); Or. Admin. R. 123-475-0085 (Oregon Public Art Advisory Comm.); S.D. Admin. Code 24:52:02:01–02 (South Dakota Office of History); 13 Texas Admin. Code § 111.18 (Texas State Capitol Collection).

[11] *See*, *e.g.*, Alaska Stat. § 14.57.050; Fla. Stat. Ann. §§ 265.704(1), 265.706(6); Kan. Stat. Ann. § 75-2701(a)(1); S.D. Codified Laws § 1-19A-11.

*General* at 235-36. Although the safest course is always to promulgate the policy standards by regulation, we believe that the Commission is not required to do so.

We are less sure about the Commission's accession policy, in large part because whether it requires a regulation may depend on the scope of the final policy. To the extent that the accession policy merely sets criteria for determining which objects owned or purchased by the State are worthy of being added to the Commission's official inventory of artistic property, this is an internal function that does not seem to have any direct or substantial effect on the public. It "does not define the circumstances under which [persons] shall be granted or denied benefits," and "[i]t does not command the public to do anything, prohibit the public from doing anything or declare the rights of the public in any respect." *Doe v. Chang*, 58 Haw. 94, 96 (1977).

If, however, the policy sets forth criteria for the Commission's approval of the *acquisition* of items, it arguably has a greater impact on the public or, at least, the segment of the public that might want to sell art to the State. This type of policy also bears some similarity to a procurement regulation, and the General Assembly has explicitly required government units to adopt their procurement rules as regulations. *See* SFP § 12-108. In light of these factors, the Legislature may not have "intended that the [Commission] be free to adopt, change, or abrogate the [accession policy] at will, without any public input or legislative review." *Evans*, 396 Md. at 347-48. If the accession policy will cover this type of ground, therefore, the Commission should promulgate it (or, if it so chooses, the collection management policy in its entirety) as a regulation.

Although the Commission does not have explicit statutory authority to adopt legislative regulations with the force of law, that authority is granted to the Archives, *see* SG § 9-1007(a)(1), and the Archives could promulgate the relevant regulations on the Commission's behalf. Moreover, the Commission, like all State agencies, has the inherent power to issue "interpretive" regulations that merely guide its interpretation of the statute it administers and could do so here. *See*, *e.g.*, *State v. Copes*, 175 Md. App. 351, 380 (2007); 62 *Opinions of the Attorney General* 36, 39 (1977).

### III

### Conclusion

The Commission on Artistic Property has substantial control over its own inventory, but, in order to dispose of State property, it

must follow the procedures outlined in the State Finance & Procurement Article. If the property in question is not a "valuable painting" or "other object[] of decorative art" worthy of inclusion in the official inventory of artistic property, the Commission may declare it to be excess and dispose of it through DGS's excess property program. But if the property is properly part of the Commission's official inventory, the property may only be transferred with approval from the Board of Public Works. Finally, the Commission may develop a collections management policy without formally promulgating it as a regulation, but only if that policy does not significantly affect the rights of the public.

> Brian E. Frosh
> Attorney General of Maryland

> Patrick B. Hughes
> Assistant Attorney General

Adam D. Snyder
Chief Counsel, Opinions & Advice